## OILS INCORPORATED v. CORPORATION COMMISSION et al.

No. 24132.   Sept. 12, 1933.

Rehearing Denied Oct. 10, 1933.

Pearson & Houston, for plaintiff in error.

E. S. Ratliff, for defendants in error.

BUSBY, J.  This is an appeal from an order of the Corporation Commission denying an application of the plaintiff in error, Oils Incorporated, a corporation, to adjust and increase the allowable production of an oil well owned by it.

The well in question is known as Ross

No. 1 well. It is situated in the Oklahoma City field in a populous district and in close proximity to the city limits of Oklahoma City. The well became a producer on October 4, 1930. It was open for one hour and 25 minutes and produced during that time 8,598 barrels of oil. This production was at the rate of 145,680 barrels per 24-hour day, flowing through a casing 6 5/8 inches in diameter.

The operators of the well decided that the tremendous amount of oil which the well was capable of producing could not be allowed to flow without considerable danger of losing control of the well and allowing quantities of oil to escape to the possible danger and detriment to the surrounding property owners. In order to minimize this hazard, a hydraulic "choke" was installed which was 3 5/8 inches in diameter. The installation of this choke reduced the production of the well 2,360 barrels per hour.

At the time this well was brought in, the production in the Oklahoma City field was being regulated by the Corporation Commission by virtue of the authority vested in it by the provisions of sections 11565 to 11574, inclusive, O. S. 1931. The allowable production of each of the wells in the field was at that time determined on what was known as the "time proration plan." On January 1, 1931, the method of calculating the allowable production of each well in the field was changed to a "percentage plan." This change of plan was formally promulgated by the Corporation Commission of this state by order No. 5414, in Corporation Commission cause No. 10326. While that order is not incorporated in the record in this cause, it is referred to in various orders contained therein, and being legislative in its character, judicial notice of its provisions may properly be taken by this court. 23 C. J. p. 99, par. 1897.

For the purpose of determining the production of Ross Well No. 1, a gauge of potentials of the well was taken on January 6, 1931, pursuant to the provisions of order No. 5414. This potential was taken through the 3 5/8-inch choke which had previously been installed on the well and the rate of production was 56,643 barrels for 24-hour day. Another potential was taken through the 3 5/8 inch choke in April of 1931, and the rate of daily production through the choke was determined to be 55,239 barrels. The well in question was closed down on August 4, 1931, and so far as the record

discloses has not been permitted to produce since that time. On the 26th day of February, 1932, the plaintiff in error herein filed with the Corporation Commission an application to readjust its allowable, claiming that the amount which it should be allowed to produce should be based and calculated upon the production that could be accomplished by its well operating in the absence of the choke, and requesting in substance that the amount which the well could produce in the absence of the choke be ascertained by the Commission by process of mathematical calculation, and that after determining the amount of such possible production the Commission adjust the allowable of wells upon that basis, and further requesting that the order adjusting allowables be made retroactive in effect and that the well be determined to have been previously underproduced. A number of hearings were had upon this application at which testimony was introduced, and the matter was formally decided by the Commission on September 19, 1932. The Commission determined that the production of the well belonging to the plaintiff in error should be ascertained upon the basis of the production that could be accomplished through the 3 5/8 inch choke which had been voluntarily installed by the operator. From this order of the Corporation Commission, an appeal has been perfected to this court. Various assignments of error are presented by the plaintiff in its brief under three propositions.

These various propositions are centered around and are based upon the claim by the plaintiff in error that it was entitled to be given a potential based upon the actual capacity of its well to produce oil in the absence of a choke, and involve a determination of what is meant by the provisions of section 11568, O. S. 1931, a portion of which reads:

"That whenever the full production from any common source of supply of crude oil or petroleum in this state can only be obtained under conditions constituting waste, as herein defined, then any person, firm or corporation, having the right to drill into and produce oil from any such common source of supply, may take therefrom only such proportion of all crude oil and petroleum that may be produced therefrom, without waste, as the production of the well or wells of any such person, firm or corporation, bears to the total production of such common source of supply.* * *"

The principal question involved in this case concerns the meaning of the word "production" as used in the foregoing statu-

tory provision. It is the contention of the plaintiff in error that the production of his well, or wells, should be interpreted to mean the maximum possible production, as opposed to the view taken by the Corporation Commission that this statute should be interpreted to mean the amount which would have been produced from the well, or which the well would be producing in the absence of any proration restrictions.

It is apparent in this case that in the absence of any proration laws, the operator of the well in question would be operating the same by producing through a 3 5/8 inch choke which had been installed on the well. But this method of operation was voluntarily adopted by the operator out of an abundance of precaution in order to minimize the likelihood of oil escaping and the hazard of damage to surrounding property that would arise from such escaping oil.

The reasoning upon which the Corporation Commission decided that the production of a well or wells of the plaintiff in error, as contemplated by section 11568, supra, should be based upon the production through the 3 5/8 inch choke, is clearly expressed in the order of the Commission in deciding this case, the pertinent portion of which reads as follows:

"It was shown that at the time of the bringing in of production of this well, that the Oklahoma City oil field was then being prorated on a time basis, but that thereafter, on January 3, 1931, the field was placed upon the percentage basis by the terms and provisions of order No. 5414, made and entered on that date, and a requirement was made that all wells in the Oklahoma City field be required to take potential, which potential must be witnessed by adjoining operators. It was shown that due to its location adjacent to both the residential and business district of Oklahoma City, the officials of the company decided that it was dangerous to produce such a well through a 6 5/8 inch casing, and that on October 6, 1930, a choke of 3-5/8 inch was installed as a matter of precaution and safety; this choke being placed within a 6 5/8 inch casing, reducing the space through which the well might be permitted to flow, from 34.37 square inches, to 10.32 square inches, and, it is contended, necessarily reducing the amount of oil which it was possible for the well to produce; that on January 6, 1931, pursuant to orders of the Commission, the umpire's office took a potential of this well through the 3 5/8 inch choke, and found the potential to be 56,643 barrels per 24-hour period; that on April 4, 1931, the umpire's office took another potential of the well and found the 24-hour potential to be 55,329 barrels, or a decline of only 1,314 barrels. Witnesses for the company calculated that had the well been allowed to produce through the 6 5/8 inch casing, up to March 1, 1932, based upon the percentage allowable in effect, the production would have amounted to 1,082,347 barrels, as against the actual production from the period commencing October 4, 1930, and ending March 1, 1932, amounting to 1,078,178 barrels, or a slight underproduction to March 1, 1932. The evidence discloses that this well was operated, without authority, almost daily from October 4, 1930, to August 4, 1931, at which time the entire Oklahoma City field was closed, in pursuance to military authorities, and that during this period of production the well was never operated under the official potential determined by the umpire's office on January 6, 1931, or April 4, 1931, and that by reason of this operation the well was overproduced on August 4, 1931, in excess of 700,000 barrels of oil.

"The contention of applicant, or applicants, in each of the applications, was based entirely upon the right of the company to produce this well on the estimated potential made by the officers of the company itself, and based upon the production for the first hour and 25 minutes. This calculation and this test was not participated in by any adjoining operator, neither was it witnessed by the umpire's staff or other official representing the Commission. The company found, as a practical matter in the operation of the well, and found as a safety measure, that it was impossible to operate or produce the oil from the well through the 6 5/8 inch casing, but in the exercise of its own judgment, and as a matter of protection, chose to install 3 5/8 inch choke, and to operate same in the production of oil through that choke. There was no requirement of law or order of the Commission, which influenced the owners and operators of this well, in the installation of this choke. It would have been necessary to have operated the well in the best practical manner in the absence of proration, and the duty and responsibility of the company would have been the same, regardless of the orders of the Commission requiring the proration of oil and the taking of potential in the Oklahoma City field. In other words, the company chose to install the choke and to operate the well in the manner in which it has been operated, voluntarily, and as a matter of good business. There are numerous wells now operated in the Oklahoma City field under similar circumstances and conditions. Should the application herein be granted, no doubt the Commission would be confronted with numerous similar applications seeking relief at the hands of the Commission, from conditions over which the operators have no control, and in the meeting of which it is necessary to exercise business judgment.

This company did exercise its best judgment with respect to the method and manner in which this well should be produced. It does not appear now that it should be heard to complain with respect to the amount of oil which it has been permitted to produce under these circumstances."

In determining whether the view adopted by the Corporation Commission is a proper interpretation and application of the statutory provision in question, we should bear in mind the familiar rule of statutory construction, that the intention of the lawmakers when ascertained should govern, and that for the purpose of ascertaining their intention all of the various portions of the legislative enactment on the particular subject should be considered and construed together. In re Cleveland's Claim, 72 Okla. 279, 180 P. 852; Bohard v. Anderson, 24 Okla. 82, 103 P. 742. It is also proper for the court, in determining the intention of the Legislature and the meaning and interpretation to be given to any particular phase or portion of the statutes, to look to the evil and mischief intended to be remedied by the statutes and to the natural or absurd consequences of any particular interpretation. Blevins v. W. A. Graham Co., 72 Okla. 308, 182 P. 247. Bearing in mind these rules of statutory construction, it is of primary importance in arriving at a proper solution of the question before us, that we consider the primary purpose of the proration statutes of this state. The constitutionality of the proration statutes has been upheld by the courts on the theory that their enactment by the Legislature is a proper exercise of the police power of the state in order to prevent the physical waste of a natural resource. Champlin Ref. Co. v. Corporation Commission, 286 U. S. 210, 52 S. Ct. 559, 76 L. Ed. 1062. See, also, C. C. Julian Oil & Royalty Co. v. Capshaw, 145 Okla. 237, 292 P. 841.

The general purpose of the proration statute was ably stated in the case of H. F. Wilcox Oil & Gas Co. v. State, 162 Okla. 89, 19 P. (2d) 347, where the following language appears in the opinion:

"When the full production of oil from any common source of supply cannot be obtained without waste, then and then only is proportionate taking of oil from that common source of supply required. Then such portion of the oil in the common source of supply may be produced therefrom as may be produced without waste."

The waste intended to be prevented by the practical operation of these statutory provisions is defined by section 11567, O. S. 1931, which reads:

"That the term 'waste,' as used herein, in addition to its ordinary meaning, shall include economic waste, underground waste, surface waste and waste incident to the production of crude oil or petroleum in excess of transportation or marketing facilities or reasonable market demands.* * *"

It appears in this case that the plaintiff in error in the exercise of business judgment in the operation of his well would, even in the absence of a proration statute, in order to prevent surface waste and the incidental hazards that might result therefrom, operate his well through a 3 5/8 inch choke, thereby voluntarily reducing the quantity of oil that could be produced therefrom. To the extent of the reduction in his production that is created by this prudent and cautious manner of operation, he is doing the very thing which other operators may be compelled to do by the enactment and enforcement of proration laws. The question then presents itself: Should such a prudent and cautious operator be compelled to further reduce the amount of his production by the enactment and enforcement of proration laws on the same ratio that his neighbor, who is producing from the same source of common supply, is compelled to reduce his production, even though that neighbor in the exercise of his business judgment has seen fit to assume the hazard that might attend production in the absence of mechanical appliances, such as chokes, tending to reduce the probability of waste and the hazards incident thereto? In other words, and in order to test the application of the rule adopted by the Corporation Commission in this case, let us assume that a neighboring well of practically the same potential possibilities as the well under consideration is being operated in the absence of proration by an operator of wreckless disposition, who places no choke or mechanical appliance on his well reducing the amount of oil produced therefrom, choosing rather to produce through an "open hole" in reckless disregard of the possible waste that might be occasioned by losing control of the well, and in reckless disregard of the possible damage that might be occasioned therefrom. Assume further that the Corporation Commission, in the exercise of the power conferred upon it by law, places the field in which these two wells are situated under proration. Should the amount of permissible production of each of the wells be ascertained upon the basis of the amount of oil that they are actually producing, without regard to the difference in the manner in which they had been

operated, or the reasons that actuated the operators to adopt their respective methods of operations, or should the allowable production of each of the wells be based upon the maximum possible production, and should consideration be given to the prudent operator for the voluntary reduction made by him in order to prevent physical waste? In our opinion the latter method of determining the allowable production is in accord with the principles of simple justice and fair dealing, and is likewise in accord wth the purpose and intent of the proration law. It seems to us that the practice adopted by the Corporation Commission in the case at bar **operates to penalize the cautious and reward the reckless.** The purpose of the provisions of the law under consideration is to provide for an equitable, fair and ratable taking by each producer from a common source of supply. As was said in the case of H. F. Wilcox Oil & Gas Co. v. State, supra:

"In order to prevent one producer from a common source of supply obtaining a greater portion of the oil in the common source of supply than the potential production of his well bears to the potential production of the other wells producing from the common source of supply, the Corporation Commission is authorized to regulate the taking of oil therefrom and to prevent the inequitable or unfair taking from that common source of supply by any person, firm or corporation."

It seems equally obvious that it is the duty of the Corporation Commission in determining the potential production of any well in the field to take into consideration and make allowance for previous reduction in the amount of production that has been made for the purpose of preventing or lessening the possibility of physical waste.

The determination of a potential production of the well of the plaintiff in error is made on the basis of the production through a 3 5/8 inch choke, without regard to the fact that the 3 5/8 inch choke reduced materially the amount of possible production, and that such voluntary reduction by the operator has been made for the purpose of preventing possible physical waste and avoiding damages to surrounding property that might be incident thereto.

When the failure to consider this important fact was called to the attention of the Corporation Commission by the filing of the plaintiff in error's application to readjust their allowables, it became the duty of the Commission to redetermine the production of the well in question upon the basis of the amount it would produce in the absence of a choke. This was especially true in view of the fact that no potential had been taken of the well for almost one year previous to the time the application to readjust allowables was filed, and in view of the further fact that basic order No. 5414 by its provisions contemplated a readjustment of potential during each quarterly period of three calendar months.

It seems that the Corporation Commission has not entirely overlooked the method of reasoning or the interpretation of the law which we are now announcing. In determining the amount of production of another well in the Oklahoma City field, an order was made which for the purpose of comparison has been incorporated in the record herein. That order reads in part as follows:

"Order—5604, Findings—

"Wherefore, premises considered and the Commission being fully advised finds:

"1. That the well of plaintiffs is located in a very short distance from the business district of the city of Oklahoma City and that said well is producing from what is known as the Wilcox sand horizon of the field, which said horizon produced wells of enormous capacity, both of oil and gas, and that many of said wells produce a large amount of sand, and the danger of such wells getting loose and out of control is very greatly due to these factors; that due to the close proximity of wells in this immediate vicinity to the business district of Oklahoma City, the danger of the lives and property of the citizens of this city are much greater than the danger from wells located in other parts of the field more remote from the congested district of the city and from wells located in parts of the field where the oil and gas pressures and columns are not so great and where the dangers from sand cuttings are not so great.

"2. That as an additional safety precaution and solely for the protection of the lives and property of the citizens of Oklahoma City the plaintiffs have equipped their well with an extra string of small pipe and sand screen, same not being commonly used in equipping wells in this field, at an additional cost of approximately $10,000, and that the use of such additional equipment in said well has greatly reduced chances for such well getting loose and out of control and has greatly reduced the hazard to the lives and property of the citizens of this city.

"3. That all known data and facts regarding said well, such as thickness of sand, gas pressure and volume, etc., indicate that said well would be just as large a well and would produce at least as much

oil per day as the average wells immediately surrounding said well if said well were equipped as other wells in the immediate neighborhood without the string of small pipe and the sand screen; and that the well of plaintiffs, if it were possible to gauge said well in the same manner and though the same size openings as adjacent wells are gauged, would show an open flow capacity equal to the average of the wells adjacent to said well and would be given an allowable flow equal at least to the average allowable flow permitted the adjacent and offset wells.

"4. That by reason of the use of the sand screen and small string of pipe, the open flow capacity of plaintiffs' well has been greatly reduced, and that it would be unjust and inequitable to establish a potential upon plaintiffs' well based upon an open flow through said five-inch casing and sand screen, when the other wells surrounding plaintiffs' lease have their potentials established and their allowable production calculated upon an open flow through pipes of larger sizes or openings and without sand screens; that to establish the potential of plaintiffs' well upon such a basis, and to calculate the allowable flow for plaintiffs' well upon such a basis, would result in an unfair and disproportionate taking of oil from a common pool or source by the wells offsetting and adjacent to plaintiffs' lease and would result in enormous drainage of plaintiffs' property by the offsetting wells and would result in irreparable damage to plaintiffs' property; and further, for this Commission to permit such inequity to exist would tend to discourage operators to use all possible safety precautions in completing their wells.

"Order.

"It is therefore, ordered, premises considered, that the application of the plaintiffs herein for an increased allowable flow from the well of plaintiffs, located on the Empire Refinery site in the northwest quarter of section 3, township 11 north, range 3 west, Oklahoma county, Okla., be and the same is hereby granted and allowed.

"It is the further order that the umpire of the Corporation Commission in the Oklahoma City field shall, in arriving at the potential capacity of the plaintiffs' well herein described, take the total potential capacity of the eight wells nearest to the plaintiffs' well and divide said figure by eight, and that the amount so arrived at or obtained shall be considered as the potential capacity of plaintiffs' well, and that in calculating how much oil plaintiff shall be permitted to produce from his well under the proration orders of this Commission in force in the Oklahoma City field, the figure so arrived at shall be used.

"It is further ordered, that hereafter, when new potentials may be taken in the Oklahoma City field, the eight producing wells which are nearest to plaintiffs' well and upon which potentials are taken, shall be used in arriving at the figure which shall be used as the potential of plaintiffs' well, same to be calculated as above outlined.

"Done at Oklahoma City this the 18th day of September 1931.

"Corporation Commission of Oklahoma,

"Paul A. Walker, Chairman,

"C. C. Childers, Commissioner,

"E. R. Hughes, Commissioner."

While we sustain the position of the plaintiff in error to the extent that we decide that he was entitled to have the production of his well based upon an open hole flow, we cannot agree with his further contention that he is entitled to dictate to the Commission the manner in which the amount of the open flow production should be determined. The plaintiff in error insists that the amount of production should be determined by a method of mathematical calculation based upon the production of the well at the time it was brought in on production. The method in which the potential production of the well should be determined is a matter peculiarly within the province of the Corporation Commission, subject only to the limitations prescribed by law. Section 11569, O. S. 1931, provides, in part:

"That for the purpose of determining such production, a gauge of each well shall be taken under rules and regulations to be prescribed by the Corporation Commission."

It will be seen from an examination of this provision that a gauge of potential is contemplated by the statutes as the basic fact in determining the production of a well. The Commission may or may not decide that the amount of the production of the well may be determined by taking the potential through the choke and by mathematical calculation making due allowance for the difference in area between the choke and the open well. They may decide upon proper showing that other factors, such as the porosity of the producing sand and the supply of oil at the bottom of the well, have an important bearing on the amount of oil that could be produced in the absence of a choke. The Commission might decide that it is feasible to remove the choke from the well for the purpose of taking the potential of the well, and thus ascertain its potential without the necessity of complicated mathematical calculations which are bound to be more or less uncertain. As stated above, the method

of determining the potential production of the well is a matter for the Commission to decide upon. And it is within their province and duty in so deciding to take into consideration all of the elements and factors necessary to arrive at a just conclusion. The determination of the potential production of the plaintiffs' well should relate back to the time of the filing of the application in this case to readjust the allowable.

The plaintiff in error urges that when the production of his well is determined upon an open flow basis, it should relate back to the time of the first determination of its productive capacity. In this connection it should be mentioned that it had been determined by the Corporation Commission prior to the time that the application of the plaintiff in error was filed, that the well in question had been over-produced, and that it should be shut down until such previous over-production had been made even. If plaintiffs' contention that the order made in connection with this case, basing the productive capacity of his well upon an open flow basis, should relate back to the time the productive capacity was determined by the Commission, should be sustained, it would have the practical effect of determining that his well was underproduced instead of overproduced. The previous orders of the Commission determining the amount of the production of his well are referred to in the record, but are not incorporated therein. They involve an application to the property rights of the plaintiff of the general rules promulgated by the Corporation Commission, and are judicial in their nature. They are presumed to be valid on their face. State ex rel. v. H. F. Wilcox Oil & Gas Co., 162 Okla. 237, 19 P. (2d) 572. These orders were not appealed from and became final. The only attack made on them in this proceeding is that an erroneous method of calculating the amount of production was used. Instead of perfecting an appeal in the manner provided by law from the order determining the productive capacity of the well of the plaintiff, the plaintiff apparently chose to ignore the previous decision of the Corporation Commission, and produced on the basis it thought to be proper. A proper and just administration of the law demands an observance of the orders of the judicial, quasi-judicial, and administrative tribunals of the state. When orders are made within the scope of the authority of the Corporation Commission, the party affected thereby has an adequate remedy by

appeal, and may thereby obtain relief from an erroneous decision. They may not ignore the order and judgment of the inferior tribunal and treat it as though it had never been made, continuously violate its provisions, and when caught in the act of violation defend upon the theory that the order was erroneous. The binding force and effect of the decision of an administrative board or officer acting in a judicial or quasi-judicial capacity is fully considered and analyzed in the case of Champlin v. Oklahoma Tax Commission, 163 Okla. 185, 20 P. (2d) 904.

It should be remembered, in this connection, however, that the previous orders are not incorporated in the record now before us, and no attack is made thereon on the theory that they are invalid upon their face. We are, therefore, not considering nor passing upon that question.

In considering the effect of plaintiff's application and such proper order as may be made hereafter in this matter, it should be remembered that while the previous orders of the Commission became final, by virtue of the legislative provision of basic order No. 5414, supra, it was contemplated that an order determining the productive capacity of an oil well should be of short duration, and that each quarterly period of three calendar months was made a separate potential at the end of which the previous order determining the potential production of a well could be superseded by a subsequent order of the Commission, and that at the time the application to readjust the allowable production of the well in question was filed, almost a year had expired since the last order determining the allowable production of the plaintiff's well had been made.

This cause will, therefore, be reversed and remanded to the Corporation Commission, with directions to ascertain the potential production of Ross No. 1 well, on an open flow basis, such order to be retroactive in its effect as of the date the application to readjust allowables was filed in this case.

RILEY, C. J., CULLISON, V. C. J., and SWINDALL, ANDREWS, McNEILL, OSBORN, BAYLESS, and WELCH, JJ., concur.

---

ANDREWS, J. (specially concurring). The record in this case shows the necessity for a compliance by the Corporation Commission with the provisions of the statute which require the Corporation Commission to

make rules for the prevention of waste of crude oil prior to any attempt by the Corporation Commission to prevent such waste. The statute requires the Corporation Commission, under certain circumstances, to prevent waste, but the statute making that requirement and giving the Corporation Commission authority to act is just as specific in its requirement that, before the Corporation Commission may act to prevent waste of crude oil, it must provide rules providing the procedure by which its authority to prevent waste is to be exercised. Under that statute, before the Corporation Commission is authorized to ascertain the potential production of any oil well, it is required to adopt rules providing the manner in which the potential production of all oil wells is to be ascertained. The Corporation Commission is not authorized to ascertain the production of an oil well in the manner it then thinks advisable, and without having adopted rules providing the manner in which the production of all oil wells shall be ascertained. To hold that it had that authority would be to hold that it was authorized to do what the record in this case shows it has done, which is to ascertain the production of one oil well in a different manner than that used in the ascertaining of the production of other wells. If the potential production of oil wells is to be taken through a choke or other appliances operating to reduce the amount of the production, the Corporation Commission must adopt a rule to that effect, and must apply that practice to all wells. I am calling attention to the evident failure of the Corporation Commission to comply with the plain and unambiguous provisions of the statute.