Application of LITTLE NICK OIL CO.

Nos. 35392, 35437. June 23, 1953.

*258 P. 2d 1184.*

as the southwest quarter of the northwest quarter of section 22, township 5 north, range 8 west, located in the area commonly known as the Chickasha Gas Field, of Grady county, Oklahoma. The lease is in the ordinary "Producer's 88" form, except that it contains a provision allowing the lessee to "pool or combine" the leased premises, or any portion thereof, with contiguous land when in "lessee's judgment it is necessary or advisable to do so in order to properly develop and operate said lease(d) premises so as to promote the conservation of oil, gas or other minerals in and under and that may be produced from said premises . . ." This provision also provided that in the event the lessee desired to exercise this option to "pool or combine" the lease with such other leaseholds, he should make it known by recording "an instrument" in the county's conveyance records identifying and describing the pooled acreage. It also provided:

"If production is *found* on the pooled acreage it shall be treated as if production is had from this lease, whether the well or wells be located on the premises covered by this lease, or not." (Emphasis ours.)

Thereafter, on October 7, 1946, Mr. Cleary assigned the lease to Stanolind Oil & Gas Company, hereinafter referred to merely as "Stanolind." The tract covered thereby is contiguous to a leasehold that is combined with other leases in what is known as the "Tide Water Unit." Gas production from this unit comes out of two wells, one of which is called the "Tide Water Associated Oil Company Tendall No. 2 Well" or merely "Tendall No. 2 Well." The gas production in the field comes from three sands or zones at different depths known as the "Glover," "the "Pooler-Mona", or just Pooler, and the "'Charlson" or "Lower Charlson." The production from the wells in the field drilled to its common pools, reservoirs, or sources of supply in these sands, has for some time in the past been regulated by orders of the State

L. A. Thompson and W. W. Heard, Tulsa, and Norton Standeven and Barth P. Walker, Oklahoma City, for appellant Stanolind Oil & Gas Company.

Floyd Green, Conservation Atty., and Ferrill H. Rogers, Asst. Conservation Atty., for appellee Corporation Commission.

BLACKBIRD, J. On September 26, 1946, one John Cleary obtained a five-year oil and gas lease from Lewis O. Tendall, the landowner, covering an undeveloped 40 acres of land described

Corporation Commission, usually hereinafter referred to merely as the "Commission."

The size and shape of these pools or the surface area overlying them has been variously defined, and marked out or outlined on surface maps from time to time on the basis of drilling and geological data obtained as explorations in the field have spread and progressed. Such information and data has been introduced as evidence in appropriate hearings held before the Corporation Commission. When new discoveries have proved the underground boundaries or limits and physical characteristics of these pools to be different than earlier indicated, the Commission has revised, adjusted or superseded its previous orders to conform to such proof, and its production-regulatory orders have been amended accordingly, with the announced purpose of conserving the gas in, and protecting the correlative rights of, all parties owning such mineral interests in land overlying the pools. In accord with this general plan or purpose and its said orders, the Commission, through its Conservation Director, has each month assigned maximum allowable production quotas to the different wells in the field. The Tendall No. 2 well, like the other wells, has had a definite maximum allowable each month. An important factor taken into consideration in computing these so-called production "allowables" has, of course, been the market demand for the gas from the field.

There has never been a producing well drilled to either of the above-named gas sands on the 40-acre tract covered by Stanolind's lease, which we will hereinafter usually refer to merely as the Tendall lease or acreage. Toward the end of said lease's term, Stanolind decided to exercise the above-described option contained in its said lease, to combine said leasehold with some other leaseholds and thus make it a part of a unit. For this purpose, said company contacted the lessees in the adjoining Tide Water Unit, and after negotiations extending over a considerable period, succeeding in obtaining their execution of a contract called "Operating Agreement," in which said lessees gave their consent to the inclusion of the Tendall tract in said Unit and agreed with Stanolind to various provisions, therein set forth, regarding said leasehold's participation in said Unit. This contract was based upon a stipulation and agreement among the parties, themselves, as to how many acres of the 40 overlay the three different gas producing zones. It was estimated and agreed that said 40 acres probably contained the following respective acreages overlying and potentially productive from the three zones, as follows: Glover, 27.5 acres; Lower Charlson, 31 acres; and Pooler, 20 acres. On this basis, agreement was also reached as to the proportion of the proceeds of production and operating expenses of the Unit, as a whole, that Stanolind would participate in. This agreement was not finally reduced to writing until August 31, 1951 (only 26 days before Stanolind's lease was to expire); and the Tide Water Unit's operator, Oklahoma Natural Gas Company, before it would sign the agreement, required Stanolind to supplement said agreement, with a letter in which it agreed to indemnify the lessees of the Unit against loss, expense or damages in the event that it should be determined by a subsequent court action that such agreement was illegal or improper.

Thereafter, before filing in the conveyance records of Grady county, any instrument evidencing this "pooling" arrangement, as provided in its lease, Stanolind set out to make it officially effective by getting the Corporation Commission to increase the Tendall No. 2 Well's allowable on the basis of the additional so-called "productive acreage" that, in its above-described agreement with said well's operators, had been settled upon as being within said

well's sphere of drainage from the three zones.

At that time, the drainage areas of wells in the field, or the productive acreage attributed to them, out of the three gas sands or zones, were fixed by certain previous orders of the Corporation Commission, and subsequent amendments thereto. The particular order in effect on August 31, 1951, was Order No. 20536, entered by the Commission at a regular hearing in its cause CD 1463, on October 30, 1947. When said order was entered, and pursuant to its direction, the following "productive acreages" in the three sands or zones were attributed to the Tendall No. 2 Well, to wit: Lower Charlson—120 acres, Glover—131 acres, Pooler—140 acres. Under said order, the monthly allowables of the wells in the field were computed by using a formula prescribed therein. "Productive acreage" was one of the important elements or factors in the formula, and under its operation, a well's allowable would increase or decrease in direct relation to an increase or decrease in the "productive acreage" attributed to it.

Stanolind was obviously cognizant of the effect of an increase in a well's "productive acreage" upon its monthly allowable, when it addressed a letter, dated September 10, 1951, to Mr. Walker T. Pound, Director of Conservation for the Commission, referring to the agreement it had obtained from lessees in the Tide Water Unit for allowing its Tendall lease to be combined with or incorporated in that Unit. In the letter, Stanolind inclosed the affidavit of one of its production superintendents in which the productive acreage then officially attributed to the Tendall No. 2 Well under the Commission's order No. 20536, supra, was referred to, among other facts, and it was represented that the Tendall lease possessed the productive acreages of 31, 27.5 and 20 in the field's three respective gas producing zones (as above shown to have been agreed to, stipu-

lated and set up in the "operating agreement"). In said affidavit, it was further represented that "pursuant" to said agreement "and the terms of" Stanolind's lease, it "has unitized and attributed such oil and gas lease unto the . . . Tendall Well for the purposes specified in" the operating agreement and lease. This letter to the Conservation Director represented said inclosed affidavit as "setting forth the facts which are essential to your increasing the gas allowable to the Tide Water Associated Oil Company No. 2 Well . . . in accordance with Order No. 20536, heretofore issued by the Corporation Commission." On the basis of this letter and said inclosure, Director Pound then "attributed" to the Tide Water Unit's Tendall No. 2 Well, the "productive acreages" that the Tendall lease was said, in Stanolind's affidavit, to have, and increased said well's allowable and adjusted other wells' proportionate shares of the field's total allowed production, accordingly, incorporating such revisions in the schedule of allowables promulgated for said field for the month of September, 1951.

On September 27, 1951, Little Nick Oil Company, on the theory that Stanolind's lease had expired of its own terms, purchased a new lease on the 40 acres in question, from Mr. Tendall, who thereafter filed suit in the district court of Grady county, presumably to quiet his title against Stanolind's lease, on the same theory. While this suit was pending, the Little Nick Oil Company filed its application in the Corporation Commission requesting vacation of the allowables order made by or through its Conservation Director attributing said lease's productive acreage to the Tide Water Unit's Tendall Well No. 2, as above described. In said application, it was charged, among other things, that no true or lawful unitization, as contemplated in Stanolind's lease, was in fact effected or created by the operating agreement hereinbefore described. It was pointed out that said agreement was not signed by the

land or royalty owner, Lewis O. Tendall, and that the agreement was not even fully executed or acknowledged by Carter Oil Company, one of the lessors in the Tide Water Unit, until October, the next month after Stanolind's lease had expired, and was made for the sole and underlying purpose of perpetuating Stanolind's lease. It was further charged that the purported "attribution" to the Tendall No. 2 Well of the purported "productive acreage" within said leasehold, was a nullity and without authorization either by law or by previous order of the Corporation Commission. It was specifically charged that the September gas allowable order, with said unlawful attribution as a basis, "issued by the Director of Conservation," was beyond his power and authority (ultra vires) and made without notice to, or the permission or consent of, Mr. Tendall or the applicant oil company. It was also charged that not all of the questioned lease's acreage, represented to be "productive acreage" by Stanolind for the purpose of obtaining the increase in the Tide Water Unit's allowable, was in fact productive; and it was asserted that acreage which is not actually producing cannot be attributed to a producing well without a formal application to the Commission, notice to all interested parties, a hearing, and proof of the legality of the unitization of the unit or units for which gas allowables are sought. It was further alleged that the Conservation Director's order attributing a part of the lease's acreage to the Tide Water Unit would deprive said company of its right to produce gas from the Tendall lease and have the effect of depriving it of property without due process of law.

After a hearing on the matter, the Corporation Commission entered its order No. 25290, in which it found that the ownership of the lease was involved in the suit pending in Grady county's district court, already mentioned herein. In this order, it was further stated that the Commission "is of the opinion that it should not take any action in this case that would jeopardize the rights of either party" in the district court action, "but should leave them where they were prior to the time that said 40-acre tract was attributed to the Tendall No. 2 Well by the action of the Director of Conservation." The Commission then went on to grant Little Nick Oil Company's application and vacate the increased allowable complained of, and directed the Conservation Director to take out or subtract all acreage of the Tendall tract from the "productive acreage" previously assigned or attributed to the Tidewater Unit's Tendall No. 2 Well. Stanolind then gave notice of appeal from this order; and also reopened the proceedings (CD No. 3488) by filing therein its own application, referring to the fact that in order No. 25290 (from which its appeal was then pending), the Commission had set aside the action of its Director of Conservation in promulgating allowables for the Tendall No. 2 well, on the basis of the Tendall tract's unitization with or inclusion in the Tide Water Unit, but had not made any finding or determination in said vacation order, as to whether or not said director's action was in fact or in law within the scope of his authority. In the application, it was requested that the Commission make such a finding or determination and definitely rule on the question of whether such action of the Director was proper and valid. After the hearing on this application was held in January, 1952, the Commission entered its Order No. 25437, refusing to make the requested determination and finding therein "that it could not, at this time, say whether or not the Director of Conservation was authorized by Order No. 20536, to attribute said additional acreage to the Tendall Well No. 2, since this is a question involved in the district court in Grady county, Oklahoma, but that the parties should be left in the same position that they were prior to the time that the Director of Conservation made such attribution."

In these appeals from Orders No. 25290 and No. 25437, for the purpose of briefing and herein considered as consolidated, Stanolind maintains that by said orders, which it claims are without statutory authorization, it has been deprived of its "property rights" without due process of law, contrary to the 14th Amendment to the United States Constitution and art. II, sec. 7 of the Oklahoma Constitution. It is rather difficult to definitely determine from its briefs just what "property rights" it alludes to. At one place in its brief (with apparent reference to the possible effect of the Commission's order No. 25290, on the land title action pending in Grady county district court) it asks the question:

"By attempting to preserve such a status quo, may the result not well be that the Commission, not having the power and authority to hear the evidence in respect to the controversy of title, jeodardized the rights of one or both of the parties in respect to the title controversy by issuing these Orders?"

In another place, however, Stanolind asserts that the orders complained of deny it its co-equal opportunity to produce its correlative share of the gas in the three zones of the Chickasha Field, all to the detriment of said Company "and its royalty owner." The royalty owner, Mr. Tendall, is not complaining, however; and as these orders do not have the effect of preventing the drilling of a well on said leasehold to obtain gas production, but merely foil an attempt to participate in production from a hole on another's land, it is difficult to see how any of the "correlative rights" of either is violated. Here, it is pertinent to inquire; In what manner has the parties' so-called "correlative share" in the Glover, Pooler and Charlson reservoir, been determined, unless the "Operating Agreement" and Director Pound's action constitute a "determination?" And what of the rights of neighboring owners in the same segment of these known sources of supply? Here, Stanolind has not

punctured these gas reservoirs or pools by drilling a well on its lease and by the process of "capture" thus proved that *any part* of its lease will produce from the zones involved, or that it is entitled to any "correlative share" in said gas supplies. Then, by what process has it been determined that it has any fixed, definite or certain "correlative share" in these sources of supply? While it is true that the outlines of the Glover, Pooler and Charlson reservoirs, as mapped on the Commissions order No. 20536, appear to include varying portions of the Tendall acreage, and a similar portrayal of these reservoirs was introduced by Stanolind into the evidence in these proceedings, yet, it is obvious that the Tendall lease and the Tide Water Unit's leases do not cover all of the land thereby depicted to be within these reservoir's boundaries, north and west of the southeast corner of section 22's northwest quarter-section; and nowhere in the record is the Commission, sitting as a tribunal, shown to have made any determination whatsoever, as to the probable productivity or "productive acreage" in these reservoirs, of any part of the Stanolind lease or Tendall tract. Stanolind cites no law, or order of the Corporation Commission, authorizing its Director of Conservation to make such a determination. There is reference in the briefs to paragraphs 16 and 21 of order No. 20536, but we have examined these and find them inapplicable. At least, one of these paragraphs seems to deal with a procedure for ascertaining, and adjusting allowables for, market demand for gas from the field, and does not pertain to the attribution of additional "productive acreage" for leases or units in the field.

Obviously, such an ex una parte procedure as herein attempted, and which, when called to its attention by Little Nick Oil Company, was set aside or nullified by the Commission, constitutes no such "determination", as we have been discussing. The determina-

tion of a lease's productive acreage in a common pool, reservoir or source of supply contemplated by our Conservation Act (Title 52, O. S. 1941 §81 et seq.) is a *judicial* determination arrived at only after a hearing, at which those claiming correlative rights in the common reservoir have had the opportunity of being heard, and at which competent and *substantial* evidence has been introduced to show how much of each owner's tract or acreage is likely or potentially productive. This was clearly and thoroughly demonstrated in Anderson-Prichard Oil Corp. v. Corporation Commission, 205 Okla. 672, 241 P. 2d 363, wherein this court upheld the same Commission order (No. 20536) that fixed the Tendall Well No. 2's productive acreage, which Stanolind in this case has, by private agreement, and co-operation of Mr. Pound, sought to increase. Therefore, and in view of the fact that no authority has been shown for such procedure, resulting in said well's September allowable being unauthorizedly increased, as Little Nick Oil Company complained of, we can only conclude that same was illegal. This being true, the Commission's action in nullifying it by its order No. 25290, could constitute no deprivation of property without due process of law. For a tribunal to deprive one of so-called "property rights" he must first have possessed, or been determined to possess, them. Here, it has never been established on any sound or legally recognized basis that Stanolind is entitled to the "correlative share" it claims, and tried, with the Tide Water Unit's operators and Mr. Pound's co-operation, to have bestowed upon itself in the producing zones involved. This is the principal reason that the legal propositions presented in its briefs, though undisputedly sound and correct as abstract propositions of law, have no application to this case. Since no error has been demonstrated in either of the Corporation Commission's orders herein appealed from, they are hereby affirmed.

JOHNSON, V. C. J., and CORN, O'NEAL, and WILLIAMS, JJ., concur.