**A. A. CAMERON, Plaintiff in Error,**

v.

**CORPORATION COMMISSION of the State of Oklahoma, Taft Milford, Humble Oil & Refining Company, Champlin Oil & Refining Company, Cox & Harmon, Blackwood and Nichols and Woods Petroleum Corporation, Defendants in Error.**

No. 41092.

Supreme Court of Oklahoma.

Oct. 11, 1966.

Hal D. Leaming, Smith, Leaming & Swan, Barth P. Walker, Oklahoma City, for plaintiff in error.

Robinson, Robertson & Barnes, by T. Murray Robinson, Oklahoma City, for defendants in error, Taft Milford and Champlin Petroleum Co.

Ferrill Rogers, Conservation Atty., and Nell Rhoades Fisher, Asst. Conservation Atty., Oklahoma City, for defendant in error, Corporation Commission of Oklahoma.

BLACKBIRD, Justice.

This appeal involves well spacing by this State's Corporation Commission of an alleged common source of natural gas, and gas condensate, supply in a 2720-acre area of Comanche, Grady, and Stephens Counties, at, and in the vicinity of, the point where these three counties join each other, not far from the towns of Marlow and Sterling. The producing part of this area has been referred to as the Burns-Beaver Field.

The matter came before the Corporation Commission (hereinafter referred to merely as the "Commission") upon an application filed there in September, 1963, by the defendant in error, Taft Milford, lessee of the Southwest Quarter of Section 33, and the East 70 acres of the Southeast Quarter of Section 32, both in Twp. 3 N., R. 8 W., which said quarter sections are two, of the

seventeen, he therein prayed the Commission to designate as 160-acre well spacing units in the area indicated on the plat below by the hatched-line boundary, or inclosure.

The theory upon which Milford sought to invoke the Commission's jurisdiction to space the area was that the part of the Hoxbar Formation, sometimes referred to as the "Upper Hoxbar" Formation, found in a well called the "Wah-Ah-Rock-Ah No. 3" (whose location in Sec. 3, Twp. 2 N., R. 8 W., is depicted on the plat) at the depth interval between 7715 feet and 8850 feet below the surface, is a common source of supply for that 2720-acre area.

In connection with his prayer that 160-acre drilling and spacing units be created in the area, Milford also prayed that the Commission vacated a previous order it had entered during 1956 as its Order No. 32611, that had created 20-acre spacing units for both oil and gas wells in a smaller area, which included that portion of the presently involved area, described as: SE NW, E SW, and E of Section 3, and the SW of Section 2, all in Twp. 2 N., R. 8 W., in Stephens County.

Milford's application was supported by the other lessees and operators who appear here as defendants in error, but was opposed by the plaintiff in error, who, doing business as Cameron Oil Company, is the lessee and operator of oil and gas leases covering 990 acres, or 36.4 percent of the 2720-acre area.

It was established at the hearing before the Commission that the gas reservoir in the Hoxbar Formation lies along the northerly side of the fault extending from the northwest to the southeast across the area, and portrayed by the double line drawn across the within plat; that the sands of the Hoxbar Formation, in the order of their depth, or distance from the surface, and, where existing in the area, are: the "Briscoe", the "Yule", or "Upper Wade", and the "Lower Wade", or "Wade".

Cameron contended at the hearing that these three sands did not together constitute one, or a single, source of gas supply common to the entire area, but that they were separate sources, neither of which underlaid even a majority of the 2720-acres sought to be spaced. And the controlling

question in his present appeal from the Commission's Order granting Milford's application, and purporting to create 160-acre well spacing units under the entire area, is whether or not said order can stand on the basis of the evidence and the law applicable to such cases.

According to the undisputed evidence before the Commission, 14 wells, whose names and locations are shown on the plat, have been drilled to the Hoxbar Formation in the subject area. Of these, only 8 have produced from one, or more, of the three above named sands. Of these 8, the 6 wells that have been completed in the Yule Sand are as follows: The No. 1 Messall, completed by Blackwood & Nichols, in March, 1956; the No. 1 Aitson, completed by Skelly Oil Company in May, 1956; the No. 1 Edwards, drilled by Blackwood & Nichols in July, 1956; the No. 2 Crawford, drilled by Cameron; the No. 1 Burris, drilled by Atlantic; and the No. 3 Rankin, drilled by Cameron. The other 2, of the 8, wells are the No. 1 Thompson, drilled by Cameron and Woods Petroleum Company, and producing from the Briscoe, and the afore-mentioned No. 3 Wah-Ah-Rock-Ah, which produces from the Lower Wade sand.

It was conceded at the hearing that the afore-mentioned fault trapped, or sealed off, the subject sands' gas production on its southerly, or southwesterly, side, and it was undisputed that all of the above named three sands, broken or interrupted by the fault, dip, and have been encountered generally at lower depths the farther down-dip well bores have penetrated them in a generally northeastern direction, away from the fault line. It will be noted from the plat that none of the above named wells that have produced from either one, or more, of the three sands of the Upper Hoxbar Formation, are a greater distance north or away from the southern boundary of the gas reservoir than the equivalent of the distance across an 80-acre surface area from it. This basic fact figured prominently in, and was geographically illustrated on, plats and exhibits introduced in evidence by Cameron,

including Exhibit No. 19. An attempt has been made to indicate the boundaries of the Briscoe, Yule and Lower Wade sands as depicted on the latter exhibit, by the shaded areas identified by the legend of the within plat. As thus portrayed, it will be noticed that the 160-acre tract comprising the SE¼ of Section 3, Twp. 2 N., R. 8 W., is the only such tract virtually underlaid completely by the sands of the Upper Hoxbar Formation. This picture conforms to testimony given at the hearing before the Commission by Cameron's Chief Geologist, Mr. I, that only 424 acres, or 15.6 percent, of the 2720-acre area Milford sought to have spaced, will produce from the Briscoe Sand; that only 795 acres, or 34.3 percent will produce from the Yule, or Upper Wade sand; and that only 446 acres, or 17 percent, will produce from the Lower Wade sand. Likewise, it is consistent with that witness's testimony that 1744 acres, or 64.1 percent of that 2720-acre area is non-productive, and that spacing it, as Milford proposed, and the Commission ordered, effects pooling of producing, and potentially productive, leaseholds—like those "worked", or operated, by Cameron—with leases on hundreds of acres of land not indicated to be underlaid by the same source of supply. Cameron contends that this compels the owners of interests in the productive leaseholds to share their production from a source of gas supply not indicated to be common to both of these two different categories of property; and, in effect, takes part of their share of that underground reservoir's products from them, without compensation, and without due process of law, and gives it to others not entitled to participate in such benefits.

On behalf of Milford, sometimes hereinafter referred to as "Applicant", no evidence that may be considered "substantial evidence", within that term's recognized definition (see Chenoweth v. Pan American Petroleum Corp., Okl., 382 P.2d 743) was introduced. The Oklahoma City consulting geologist, Mr. W, who was one of said applicant's two witnesses, testified that he prepared Exhibit No. 9, which was introduced in evidence, bearing markings indicating well locations and underground elevation, on contour, lines in substantially the same relative position as are depicted on the within plat. Although, he referred to his said map as delineating "the reservoir which is involved here", and stated that, for the "section" of that map representing the 2720-acre area sought to be spaced, "The general nature of the formation which is applied for here is a common source of supply * * *", and, when asked by applicant's counsel, if the 2720-acre area was a "permeably connected reservoir", answered: "Yes, I think so," the same witness testified that within the Hoxbar Formation there "are several sand zones and shale sections; * * *". As to communication between these sand zones or "lenses", he testified, " * * * there is not exactly vertical communication that I can point out to on the present wells on all of these lenses." After saying that he would demonstrate this " * * * by showing it"; the witness pointed to some unidentified well on a map before him, and testified that in it "ten or eleven feet of shale probably" *separate the (Lower) Wade section from the Yule section and " * * * there is a little greater shale interval between the so-called Yule section and the so-called Briscoe section so maybe there is vertical fracturing, and maybe there isn't; it is not definite."* (Emphasis added). When, on cross examination, Mr. W was interrogated as to specific thicknesses of shale sections between the three producing sands, he testified that there is some 50 to 100 feet of shale between the Briscoe and Yule sands and that the shale section or interval between the Yule, Wade, or Lower Wade, sands varies in thickness from 10 to 50 feet. Besides testifying to other details from which it could only be reasonably concluded that impermeable intervals lay between each of the sands, and that natural gas, and gas condensate, could not migrate from one to the other, as in one large reservoir, or common source of supply, Mr. W

frankly admitted that none of his presentation, including his maps and the contour lines drawn thereon were to be considered as proof of how far north, or northeast, from the fault line the three subject sands of the Upper Hoxbar Formation extend, or will produce.

Though the evidence introduced on behalf of the applicant might be considered in conflict with the evidence introduced by Cameron as to some of the facts, and applicant's Mr. W and Cameron's Mr. I differed in the significance they placed upon the undisputed fact that substantial salt water was encountered at the level of the Briscoe sand in Atlantic's No. 1 Burris well (in the SE of Section 31) and particularly as to the relation of that fact, if any, to the prospective productivity of the deeper Yule and Wade sands' at other places in the field where they might be encountered equally as low on the structure and/or under *a water-bearing* Briscoe sand, we find nothing in applicant's evidence to dispute Cameron's evidence as to the location, and the limited extent, of productive Briscoe sand in the field, as indicated in the shaded area of the within plat. Furthermore, Mr. I confirmed any doubt Mr. W (as hereinbefore indicated) may have expressed concerning "communication" between the three sands .involved, when he testified that from his study of "the Cox & Harmon (Wah-Ah-Rock-Ah) No. 3 well" that, in it, there is "approximately 150 feet of impervious shale and tight, non-permeable sand between the base of the Briscoe and the top of the Upper Wade sand zone * * *" and that "There's 66 feet of shale and tight, non-permeable sand streaks between the base of the Upper Wade Sandstone and the top of the lower Wade Sand Zone * * *", and further testified:

> "The three sand zones are readily correlatable, and, as you can see, there is good evidence for separation between the different sands. *There's no continuous permeable sand bodies in between from the evidence we have so far.* We feel impermeable sand barriers are correlative

and continuous and *at no place is there commingling of the fluids within them.*" (Emphasis added).

In their presentations to the Commission, the Applicant's two witnesses testified that, in their opinion, one well would drain all the gas, and gas condensate, under a 160-acre tract situated above the gas reservoir, but the interrogation of Cameron's witness, Mr. I, made the point that *this* would hold true *only if the gas-bearing sand lay under the entire 160-acres* and the well was located at the proper place on the structure. On cross examination, Mr. W admitted that he was not so much interested in the orderly development of the field, as he was in limiting the number of wells drilled there in the future, but, when he had been asked, on direct examination, if the 160-acre spacing would "prevent the drilling of unnecessary wells in the Hoxbar region, he had answered:

> "Yes, sir, I think *it would have had it been done years ago.*
>
> Would have saved *several* wells *that already have been drilled* on some of these tracts to this gas horizon." (Emphasis added).

During this witness's cross examination, it was brought out that two of the quarter sections, such as, under the spacing order sought, would be authorized only one well each, already had two wells on each of them. As to the effect of such a spacing order upon production operations on such quarter sections, an excerpt from Mr. W's testimony is as follows:

> "Q So that the net effect of your suggestion here would be to preclude those operators the opportunity to produce one of those wells?
>
> "A Theoretically, that is correct.
>
> * * * * * *
>
> "Q So that the investment that has been made would have to be recouped, so to speak, out of the other well on the unit?
>
> "A That would be correct, yes, sir."

This witness's testimony ended with the following excerpt from his redirect examination:

"Q * * * the questions that Mr. Walker asked you indicated that the Briscoe does not underlie the entire area * * *. Do you agree that it probably does not?

"A I think the sand section is *petering out to the east; we don't know what happens to the north or don't know about the west.*

"Q Then the *south and east end* of the area does not contain Briscoe but does it, in your opinion, *contain* the *other two Hoxbar Sands* which you need to space?

"A Yes, sir, it does.

"Q Then, in your opinion, would it be proper to have the spacing extend down throughout the area?

"A Yes, sir.

"Q If the Briscoe's not there, there's no harm done?

"A Correct; you can't get something you don't have." (Emphasis added).

The harm in pooling, by a 160-acre spacing order, land that has no productive sand in it, with leases that are underlaid with productive sand, was aptly indicated in the following excerpt from Mr. I's cross-examination:

"Q And if these wells are drilled at the proper spot in these 160's, then will not all of the owners of minerals that own any parts of these three reservoirs * * * participate therein when it's developed on 160-acre spacing?

"A *Not on an equitable basis.* You'll have *a great number of nonproductive acres spaced in with productive acres* on each 160-acre tract." (Emphasis added).

and direct examination:

"A * * * spacing this area would result in violation of correlative rights. Correlative rights have to a great degree already been established among the royalty owners as well as lease owners by other wells, which have been drilled and are producing in the area. If 160-acre spacing were imposed these correlative rights of both royalty and leasehold owners would be disturbed and upset."

It is rather difficult to determine upon what facts and considerations the Commission's order in the present case is based; but, it appears reasonably obvious that in treating all of the geographical strata collectively that were said to appear in the Hamon-Cox No. 3 Wah-Ah-Rock-Ah Well, between the depths of 7715 and 8850 feet in the same manner as in the Application and in finding, in substance, that those strata are *one* common source of supply, without specifically recognizing, or naming, the three sands whose thicknesses occupied vertically only parts of that depth interval, the Commission, in its order, apparently failed to recognize the significance of the undisputed proof that impervious strata of earth lay between these three gas sands (the Briscoe, the Yule, the Wade, or Lower Wade) which constitute effective barriers to the migration of gas, or gas condensate, between one or more of them.

In its order, the Commission appears to have recognized, to some degree, the limited areal extent of these three sand beds, and to have been aware of the absence of any substantial evidence that they exist, or are productive, under some of the land in the quarter-section spacing units it purported to create, but there is no indication that it accorded this fact proper significance. For instance, despite the lack of any evidence that any part of Milford's unexplored leases in the SE¼ of Section 32, and the SW¼ of Section 33, Township 3 North, Range 8 West, are underlaid by either of those sands (not even his own witnesses testified that elevation contour lines on any map, or plat, introduced in evidence were indicative of the existence, or productivity, of sands at distances from the fault line) paragraph "5"

of the "FINDINGS" part of the order states:

> "* * * the Commission finds that *each* of the 160-acre tracts contained in the area * * * is *in part* underlain by productive Hoxbar sand in the common source of supply involved * * *."

(According to Exhibit No. 19, which was made on the basis of Mr. I's studies of the region, and to which he referred in his testimony—none of the three gas-producing sands underlays either of these particular leased acreages). That the Commission failed to give proper consideration to the effect (according to the undisputed evidence) of the absence of producing sands and the existence of impervious barriers between the three sands (it treated as being *all one* common source of supply) upon the drainage patterns of wells, the property rights of the owners, and upon its own jurisdiction, is apparent from its further equivocal, or ambiguous, findings in paragraph 6 of its order, in pertinent part, as follows:

> "* * * since there is no evidence in the record that one well will not adequately and efficiently drain 160 acres *or portion thereof* an order should be made establishing 160-acre drainage and spacing units for the production of gas from the Hoxbar sand underlying the above described area. The Commission further finds that *whether the Hoxbar sand herein spaced is one or a series of producing sands* will be adequately and efficiently drained by one well to each 160 acres." (Emphasis added).

After carefully examining the record, we are at a loss to determine, with any degree of certainty, the basis therein for the emphasized statements in the following portion of paragraph 5 of the Commission's "FINDINGS":

> "* * * in spacing a long or irregularly shaped reservoir it is inevitable that all units will not be fully underlain by productive formation but *the inclusion of nonproductive acreage in some units causes less distortion of correlative rights* than would the permitting of excessive unnecessary wells or the denial of a right to each party to develop his portion thereof* and further that if inequitable withdrawals develop as a result of the spacing order this Commission has authority by field rules to enter an order protecting the correlative rights of the owners of such common source of supply * * *." (Emphasis added).

■ Most of Cameron's argument for reversal of the above quoted order is based upon the hypothesis that same purports to place in 160-acre spacing units, lands not shown to contain or overlay any of the three sands that were encountered in the Hamon-Cox No. 3 Wah-Ah-Rock-Ah well at places in the depth interval referred to in the Application, and in the Order, as "7715 feet to 8850 feet"—and, as being: "a common source of supply." In such argument, Cameron contends, in effect, that there is no substantial evidence to show that those lands have that source of supply *in common* with other lands from which Cameron and other operators in the 2720-acre spaced area are producing; and that such evidence is a necessary prerequisite to the Commission's statutory authority to include such lands in such units. We agree. That the existence of a source of supply common to lands covered by a spacing order is a necessary prerequisite to the jurisdiction of the Commission to enter such an order, is shown by the wording of our Conservation Statutes, and has always been recognized by this Court. Tit. 52 O.S.1961, § 87.1 provides, in part, as follows:

> "*Whenever* the production from *any common source of supply* of oil or natural gas in this State *can be obtained only under conditions constituting waste* or drainage not compensated by counter-drainage, then *any person having the right to drill into and produce from such common source of supply may, * * * take therefrom only such proportion of the oil or natural gas that may be produced therefrom without waste or without such drainage as the productive ca-

pacity of the well or wells of any such person considered with the acreage properly assignable to each such well bears to the total productive capacities of the wells *in such common source of supply* considered with the acreage properly assignable to each well therein.

"Establishment of units. (a) To prevent or to assist in preventing the various types of waste of oil or gas prohibited by statute, or any of said wastes, or to protect or assist in protecting the correlative rights of interested parties, *the Commission,* upon a proper application and notice given as hereinafter provided, and after a hearing as provided in said notice, *shall have the power to establish well spacing and drilling units* of specified and approximately uniform size and shape *covering any common source of supply, or prospective common source of supply,* of oil or gas within the State of Oklahoma.

"* * *." (Emphasis added).

Section 86.1(c) defines the term "common source of supply" thusly:

"The term 'Common Source of Supply' shall comprise and include *that area which is underlaid or* which, *from* geological or other scientific data, or from drilling operations, or other *evidence, appears to be underlaid,* by a common accumulation of oil or gas or both; *provided,* that, *if any such area is underlaid,* or appears from geological or other scientific data, or from drilling operations, or other evidence, to be underlaid *by more than one common accumulation of oil or gas* or both, *separated from each other by a strata of earth and not connected with each other, then such area,* as to each said common accumulation of oil or gas or both, *shall be deemed a separate* common source of supply; * * *." (Emphasis added).

(With relation to the above quoted provision, the record shows that copies of the Commission's previous orders, numbered 32611, supra, and 35670, by which latter order Cameron had been authorized to multiply complete its Crawford No. 2, well, were introduced in evidence. During the cross examination of applicant's witness, Mr. W, Cameron's attorney established that one or more of the same sands involved here were referred to as "more than one", or "separate", common sources of supply, in those orders, and, in an apparent effort to invoke "the change of conditions" rule announced in Wood Oil Co. v. Corp. Comm., 205 Okl. 537, 239 P.2d 1023, and quoted in Cameron v. Corp. Comm., Okl., 414 P.2d 266, he elicited from that witness the fact that "very little" new knowledge had been found since the latter order was entered in October, 1957, to indicate "a different type of geographical conditions in this area" than was disclosed in the Crawford No. 2 Well).

As to a predecessor of section 87.1, supra, whose wording was substantially the same as the present law, this court, in the early case of H. F. Wilcox Oil & Gas Co. v. State, 162 Okl. 89, 94, 19 P.2d 347, 352, 86 A.L.R. 421, dealing with oil allowables, held that "several sources of supply may not be combined and the total market demand from the field allocated to the several wells in the field without regard to the several sources of supply in the field", and said:

"To permit that practice would be to permit the corporation commission to exceed the authority granted to it by the provisions of section 7957, supra. *The inequitable and unfair taking sought to be prevented thereby is that 'from a common source of supply,'* the unreasonable discrimination thereby sought to be prevented is that of one 'common source of supply' against another." (Emphasis added).

With reference to the identical provisions as they appeared in the 1931 Oklahoma Statutes, we said in Oils, Inc. v. Corp. Comm. of Okla., 165 Okl. 202, 206, 25 P.2d 703, 706:

"* * * The purpose of the provisions of the law under consideration

is to provide for an equitable, fair, and ratable taking by each producer *from a common source* of supply." (Emphasis added).

And, when, in the widely followed case of Patterson v. Stanolind Oil & Gas Co., 182 Okl. 155, 77 P.2d 83, app. dism., 305 U.S. 376, 59 S.Ct. 259, 83 L.Ed 231, we upheld, as constitutional, the authority prescribed by the 1935 well spacing act for the Commission to exercise in the matter of drilling wells and distributing their production, only the rights of mineral interest holders *in lands overlaying a common source of supply* were before the court, and were considered. What we said of the well spacing order there involved, would not hold true here, where land, not shown to be underlaid by any common source of supply, is included in spacing units, with land that is actually producing. Even though no lessors or royalty owners appeared before the Commission to protest Milford's application, it would obviously be unfair to authorize an owner of mineral rights like Texas Company, as lessee of the N½ of the NW¼ of Section 4, Township 2 North, Range 8 West, to be accorded an 80-acre participation in Cameron's ⅞ths working interest in the Rankin well when there is no evidence indicating that more than a few acres bordering Cameron's lease, if any, of this 80 acres is underlaid with any of the producing sands involved. It would likewise be inequitable to authorize Taft Milford—because of his lease on the East 70 acres of Section 32, Township 3 North, Range 8 West—to participate in the lessor's part of the production from any well that Cameron may drill in the southwestern corner of its lease on the western part of that section, without any indication that Milford's lease is underlaid with any of the three sands. The same would hold true of allowing Skelly Oil Company, as lessee of the N½ of the NW¼ of Sec. 3 (Twp. 2 N., Range 8 West) to participate in the production of any well the Ambassador Oil Company may drill on leases in the South Half of that quarter sec-

tion. (Even if any part of the Hoxbar Formation underlays the Skelly lease, it is at a lower elevation according to Mr. W's contour lines, than the No. 2 Messal well, which, according to that witness' undisputed testimony, encountered the Yule and Lower Wade sands deeper than any other well in the Field). To do so, constitutes an unlawful taking of property without due process of law, equal in illegality to the ex parte order attributing alleged productive acreage of the Tendall tract to the Tidewater Unit in Application of Little Nick Oil Co., 208 Okl. 695, 258 P.2d 1184. As will be observed from the hereinbefore quoted testimony of the applicant's witness, Mr. W, he conceded that the Briscoe sand does not extend the full length of the field from west, or northwest, to the field's believed eastern end; and there was no evidence whatsoever that either of the producing sands extend under the northern part of the proposed spacing area, in the eastern part of Section 32, and in Section 33, in which the Milford leases are located. While this court has recognized that after a new oil, gas, or oil and gas, field, is initially spaced, expert opinion concerning the extent, porosity, and other pertinent characteristics, of its common source of supply, or production reservoir, may change with increasing knowledge gained by further development, tests, etc., (see the discussion in Application of Peppers Refining Co., Okl., 272 P.2d 416, 424) and whereupon it is revealed that under the initial spacing order, and its communitization provisions, some owners have received production benefits to which they were never really entitled (see the discussion and cases cited in Landowners Oil, Gas, & Roy. Own. v. Corporation Com'n., Okl., 415 P.2d 942, 950, 951), we have never said that such a restriction of property rights, and abrogation of oil and gas lease contract provisions, can be justified under a spacing order that has no expert opinion, or other substantial evidence, to support it —like the one here. The present Order differs from those upheld in both Applica-

tion of Continental Oil Co., Okl., 376 P.2d 330, and Crews v. Champlin Oil & Ref. Co., Okl., 413 P.2d 508, in this respect. It also differs from the unitization order involved in Jones Oil Co. v. Corporation Commission, Okl., 382 P.2d 751, dealing with a field in which 61 wells were producing from 2 or more sands that had been treated as a common source of supply. That order was entered in different proceedings under a different act which gives the Corporation Commission authority to unitize "a portion" of a common source of supply that " * * * has been defined and determined to be productive of oil and gas by actual drilling operations * * *" and " * * * where it is shown by the evidence * * *" that the " * * * conduct of the unitized method or methods of operation * * * will have no material adverse effect upon the remainder of such common source of supply." See sections 3 and 4 of the Twenty-Third Legislature's Senate Bill No. 203, known as The Unitization Act, S.L.1951, p. 137, now appearing as secs. 287.3 and 287.4, Tit. 52 O.S.1961, held constitutional in Woody v. State Corp. Comm., Okl., 265 P.2d 1102.

■ Not only is the present Order's effect of taking gas from some lessees, and their lessors, and/or producing royalty owners, and distributing it among others, who own interests in non-producing property, beyond the Commission's jurisdiction because no source of supply common to both of these groups was established, but also because it was not established that waste of any common reservoir's gas and hydro-carbons would result, if this area is not spaced. We recognize that proper well spacing is conducive to longer lived production and greater recovery, larger profits, and larger gross production tax payments to the State of Oklahoma, than unrestricted drilling. We also realize that the latter may result in both economic and underground waste; but there is no evidence in this case that if 160-acre spacing is not inaugurated in the Burns-Beaver

Field, wells will produce so little that they will not return a handsome profit, or will earn so little net income, over expenses, that any party having the right to drill into either of the three sands involved, will, in effect, be denied, or deprived of his right to accomplish such development, and, as a result, gas will be left in the underground reservoir that, under such spacing, would be recovered (as inferred in one hereinbefore quoted portion of the order). The estimates on the net earnings of wells on smaller than 160-acre drilling units in the field, ranged from Cameron's witness' $267,000.00 to the $550,000.00 indicated by the applicant's witness, Mr. P; and no contention has been made that either sum is not an adequate return on the cost of completing such wells, to constitute a sufficient incentive for the economic and adequate development of the three sands, and the area involved herein.

In accord with the foregoing, the order herein appealed from is reversed.

JACKSON, V. C. J., and WILLIAMS, IRWIN, BERRY, HODGES and LAVENDER, JJ., concur.