PANHANDLE EASTERN PIPE LINE
COMPANY, Plaintiff in Error,

v.

The CORPORATION COMMISSION of the
State of Oklahoma et al., Defendants
in Error (three cases).

Estella M. HUMISTON, Plaintiff in Error,

v.

The CORPORATION COMMISSION of the
State of Oklahoma et al., Defend-
ants in Error.

Nos. 36312, 36483, 36484, 36501.

Supreme Court of Oklahoma.

May 24, 1955.

As Amended June 14, 1955.

Rehearing Denied July 5, 1955.

Coleman Hayes, Oklahoma City, for plaintiff in error, Estella M. Humiston.

Monnet, Hayes & Bullis, Oklahoma City, amicus curiae.

J. B. Dudley, Oklahoma City, E. H. Lange, St. Louis, Mo., S. H. Riggs, Liberal, Kan., and D. H. Culton, Amarillo, Tex., and Dudley, Duvall & Dudley, Oklahoma City, of counsel, for plaintiff in error, Panhandle Eastern Pipe Line Co.

Forrest M. Darrough, Tulsa, Paul H. Long, Barth P. Walker, Oklahoma City, George W. Hazlett, Cleveland, Ohio, and T. Murray Robinson, Oklahoma City, for defendants in error, Carter Oil Co., Emby Kaye, and Leon J. Caine.

Floyd Green and Ferrill H. Rogers, Oklahoma City, for defendant in error, Corporation Commission of Oklahoma.

R. O. Mason, Bartlesville, for defendant in error, Cities Service Oil Co.

Robinson, Shipp, Robertson & Barnes, Oklahoma City, for defendant in error, Sohio Petroleum Co.

Howard Phillips, Borger, Tex., C. Harold Thweatt, Embry, Crowe, Tolbert, Boxley & Johnson, Oklahoma City, of counsel, for defendant in error, J. M. Huber Corp.

George W. Selinger and Hawley C. Kerr, Tulsa, for defendant in error, Skelly Oil Co.

Ralph W. Garrett, Tulsa, for defendant in error, Sinclair Oil & Gas Co.

BLACKBIRD, Justice.

The above styled and numbered appeals are so related that they have been considered and will herein be dealt with together, as if consolidated. They all involve an area of sixteen thousand acres of land in Townships 5 and 6 North, Ranges 21 and 22 East, near the Kansas-Oklahoma line in Beaver County, found by this State's Corporation Commission, in its Cause CD 4695, to overlay a common source of supply of natural gas called the "Upper Morrow Sand." By its order No. 27771, entered in said cause, said body (hereinafter referred to merely as "The Commission") established spacing units of 640 acres each, bounded as shown by the heavy lines on the plat incorporated in this opinion. Under the order only one well could be drilled and produced on each of the well-spaced units; and the wells that were then producing gas from said sand on certain of the units (which well locations are approximately indicated by small double circles "⊚" on the plat) were designated as the wells for the respective units in which they were located. From said order the two above-styled appeals docketed under Nos. 36312 and 36501, were perfected by Panhandle Eastern Pipe Line Company, hereinafter referred to merely as "Pan-East", and Estella M. Humiston, respectively.

In new proceedings instituted after the entering of the aforesaid Order No. 27771, the Commission entered so-called "pooling" orders, numbered 28332 and 28333, in its causes CD Nos. 5263, 5366, respectively. Order No. 28332 "pooled" the interests of all lessors of the unit covering Section 25, Township 6 North, Range 21 East, namely: The J. M. Huber Corporation, Sohio Oil Corporation, and Pan-East, and decreed that the first two should share with Pan-East the working interest in the well it had drilled and was producing on said unit, in the proportion the acreage covered by their

LEGEND:

• DRY HOLE
◉ GAS WELL

4.

leases bears to the total acreage of the whole unit, upon their payment to Pan-East of that same proportion of the well's cost. Order No. 28333 effected a similar pooling of the lessors' interests in Section 31, Township 6 North, Range 22 East, and directed that Carter Oil Company, Emby Kaye and Leon J. Caine, the lessors of three-fourths of the area of said section, should similarly participate in the well Pan-East had drilled on the unit covering said section.

Pan-East, as plaintiff in error, seeks a review of these latter orders in the appeals docketed in this Court as causes numbered 36483 and 36484, respectively. The gas wells involved are designated on our plat, and hereinafter referred to, as Pan-East's "Clapp" and "Humiston" wells. Other lessee companies involved, except where included in the appellation "Appellees" will, for the sake of brevity, be referred to by the first word of their names.

Pan-East and Estella M. Humiston, the only appellants from the well-spacing order (No. 27771, supra) complain that said order contains no finding in specific words defining the extent or boundaries of the Upper Morrow Sand or common source of supply of the spaced area, and they repeatedly refer to the finding therein contained that "the development which has taken place within the area * * indicates that *a major portion* * * * (thereof) is underlain by the Upper Morrow Sand common source of supply * * *." (Emphasis ours.) We think it unnecessary to deal with the contention other than to observe that the plat attached to, and made a part of, the Order as "Exhibit A", specifically outlining the spaced area (as portrayed on the above plat) may well be regarded as supplementing, and making more definite and certain, the above quoted verbal finding with reference to the extent of the common source of supply. In other words, since the Commission has no power to include within the spaced area tracts that do not overlay the common source of supply, that part of the Order which outlines such area may be deemed the equivalent of a finding as to the Commission's conception and determination of the size and shape of the common source of supply. In fact, the Act itself, Tit. 52 O.S. 1951 § 87.1(b), directs that " : (1) the outside boundaries of the surface area included in such order;" shall be shown by a plat attached thereto.

We come now to the basic or underlying cause for all faults appellants find with the well-spacing order. The key to this, as far as concerns Estella M. Humiston, who owns the royalty under the Northwest Quarter of Section 31, the site of Pan-East's prolific Humiston well, is paragraph 7 of the Order providing that the royalty owners in each spaced unit shall participate in the royalty from the well drilled thereon in the relation that the acreage owned by them bears to the total acreage of the unit. Under this provision, Mrs. Humiston will be required to share the lessor's one-eighth of said well's production, or its proceeds, with the owners of royalty under the other three-fourths of said section in the ratio or proportion of one-fourth to her and three-fourths to them.

The key to the cause of Pan-East's complaint concerning the well-spacing order is the Order's paragraph 8, which contemplates subsequent determinations, as provided by Tit. 52 O.S.1941 and 1951, § 87.1 (d), such as were announced by the Commission in the two "pooling" orders (Nos. 28332 and 28333, supra) that said company must share, in the same proportion, its working interest in, and seven-eighths part of the production from, said well in Section 31 with Carter, Emby Kaye and Leon J. Caine, and, likewise the working interest and such share of the production from its Clapp well in Section 25, with the owners of the other three-fourths of that unit, which are Huber and Sohio.

Appellants contend that by statute, Tit. 52, O.S.1951 § 231, all of the natural gas under their owned and leased land belongs to them, and that requiring them to share it with the owners and lessees of other tracts in the same section (as the Commission has done by the questioned orders) is taking their property without due process of law in violation of both the State and Federal Constitutions. Their charge that such taking is "without due process" (the

only allegation of constitution violation they attempted to specifically support with argument) stems from their contention that the evidence introduced at the hearing, out of which the orders issued, fails to show that the northern and western three-quarters of Section 25, under lease by Sohio and Huber, and the southern and eastern three-quarters of Section 31, under lease by Kaye, Caine and Carter, overlay and/or will produce, from the same source or reservoir which furnishes and supplies the production for the Clapp well in the one instance, and the Humiston in the other.

An examination of the record made at the Commission's hearing reveals little, if any, evidence introduced or effort made, by appellants, to dispute the overwhelming weight of the proof that all of the natural gas produced in the spaced area comes from the Upper Morrow Sand. In fact all parties seem to virtually agree on that. On the basis of this fact alone this sand would ordinarily be called a "common source of supply" in the common acceptation of that term. Here, however, the presence of dry holes establishes that said sand is not productive over the entire area, or at least at the particular points where those holes are located; and the alternative phrasing of the latter part of this statement furnishes a clue to the crux of the crucial question, namely: How far, and in what direction from each of these dry holes, do they prove that the Upper Morrow Sand will not produce? This question was never answered; and the only positive conclusion that can be arrived at from the testimony of the expert witnesses, including both geologists and engineers who expressed an opinion on the matter, is that it can only be resolved by further drilling. Carter, as well as others appearing in support of its application, and those opposing it, apparently agreed that said sand is not a "blanket" sand but is "erratic" in that it produces at some points, but at others close by, does or may not. The principal points of disagreement concern the meaning, or proper interpretation of this fact. The supporters of the application took the position that failure to obtain production from the dry holes was due to the sand's tightness or insufficient permeability at, and perhaps around, those locations, though none of the witnesses could state conclusively how large an area around them, if any, these holes condemned for production purposes.

■ Some of the evidence introduced on behalf of those opposing the application, was contemplated to support the theory that the Potter D and F. J. Grove holes were just two points on a ridge or wall of insufficient permeability that not only extended from one of these well locations to the other, but extended northwest-southeast bisecting Sections 25 and 31, and the whole area from dry holes in the same sands in the southern edge of Kansas to other dry holes in the same sand south and east of the spaced area, with the result that portions of said sections and the area were thereby rendered unproductive. On the basis of this hypothesis and evidence calculated to support the further one that the Upper Morrow Sand was deposited in "lenses" with areas of impermeable shale intermingled, forming various separate and unconnected gas pockets or reservoirs, and reports of surveys and analyses enabling a comparison of the bottom hole pressures of various of the producing wells and various components of the gas therefrom, Pan-East and Huber projected the theory that various of the area's wells, or at least two major groups thereof, were producing from different reservoirs or sources of supply. It was their position, on the basis of the more or less technical data they introduced and referred to, that Pan-East's Humiston and Clapp wells were producing from an entirely different and separate reservoir or "pocket" from the wells in the westernmost tier of sections in the area. Others appearing at the hearing drew opposite conclusions from the data and opined that the evidence tended to prove all of the wells are producing from the same source of supply. We have carefully examined all of the evidence, including that upon which the impermeable ridge, wall or wedge theory was based, and we find therein no fact which would

preclude the conclusion that, if such a wall or wedge in fact exists, it might just as reasonably entirely "skirt" Sections 25 and 31, or go between them, so as to impound all of the gas that may lie under all parts of each section in the same common reservoir, as to cut under and bisect either of said sections, rendering parts thereof unproductive. And, from our analysis of the evidence as a whole, we have concluded that the Commission's determination to the effect that all portions of each of these sections overlay the same common source of supply cannot be said to be without sufficient evidentiary support. This conclusion is further supported by the practical unanimity of agreement between the opposing parties' witnesses that, in the absence of barriers of impermeability or "pull" from other wells, thereby restricting or controlling the horizontal migration of gas through the sand from one location to another, one well will drain gas from under 640 acres, or a whole geographical section of land, in the area. One witness testified that an area of permeable sand only one inch thick would enable migration between thicker areas of said sand. On the basis of such extensive migration it is logical and reasonable to assume that Pan-East's Humiston and Clapp wells are probably draining gas in one or more directions from under a larger area than the 160-acre leaseholds on which they are located. We think this, in the absence of anything except conceded conjecture as to how large an area, if any, in said sections the F. J. Grove and Potter D holes condemn as unproductive, and in the absence of any proof on which trained technicians can agree as to the existence, effectiveness and location of any migration-control factors that theoretically would indicate the unproductivity of other leaseholds in said section, constitutes a valid reason for pooling all interests in each of said sections or units.

█ Appellants' suggestion that the mineral interests in the other portions of Sections 25 and 31 should not be pooled with theirs, and their owners allowed to participate in the production of the wells on Pan-East's respective leaseholds in said sections until the productivity of their tracts has been proven by drilling, either ignores the migratory character of the gas in the penetrated reservoir, or recognizes it, but evidences a desire to continue reducing this gas to their possession, with all the benefits of flush production, before their neighbors can get wells drilled. If such wells were subsequently drilled on the neighboring leaseholds into the same reservoir, then such benefits and advantages would be irretrievably lost to the other owners. To prevent loss of such correlative rights and obviate recourse to wasteful "drilling races" were the principal considerations prompting our Legislature to enact the original Well-Spacing Act in 1935. If, at some time in the conceivable future it might be established by drilling, or in some other conceivable manner, that the Upper Morrow Sand is presently unproductive in the areas of Sections 25 and 31, other than those covered by Pan-East's leaseholds, then the present spacing order can be amended to exclude those areas and terminate their owners' participation in the Clapp and Humiston wells, as was done with reference to the products of the Spiers Sand in the Chitwood Field. See the Spiers v. Magnolia Petroleum Co., cases, 206 Okl. 503 and 510, 244 P.2d 843 and 852. In the event of such proof of unproductivity it might be thought that having previously been required, by the Commission's order, to divide the production from said wells with those owners, appellants have been deprived of property rightfully belonging to them, but, if the hypothesis that one well drains a 640-acre area then still holds true, it will be realized that they have been receiving the benefit of gas drained from tracts on other sides of them, the direction and extent of which drainage depends upon the drainage pattern of the wells. If the same pattern of gas extraction is followed throughout the area it is more probable than not, that each owner of every spacing unit will ultimately receive approximately his "fair and reasonable" share of the gas in the reservoir. Some may say, as appellants suggest, that under Tit. 52 O.S.1951 § 231, supra, gas may be exclusively owned in place or "in its original state"

so that forcing an owner of a leasehold estate to divide gas in or under it with his neighbor is depriving him of property which is exclusively his own. While under said statute gas may perhaps be the subject of ownership in place—a matter not directly at issue here—it must be recognized that if in bringing such gas to the surface and reducing it to possession, such owner must also drain gas from a larger area than that covered by his lease (as it may be reasonably concluded Pan-East's wells do) he is getting the gas of others commingled with his own, for which said other owners should be compensated. This is the basis of the idea of "correlative rights" as applied to so-called "migratory" minerals such as oil and gas. See Summers, Oil & Gas, (Perm.Ed.) Vol I, secs. 62, 63.

Appellants also contend that participation in wells like the Clapp and Humiston purely on an acreage basis (in the ratio that the acreage of each owner bears to the total acreage in the units) is unsound and unfair. In Pan-East's brief, it recognizes that the converse of this might hold true "In cases where the evidence shows the existence in a given area of a blanket producing formation, with comparative uniformity in thickness of pay, porosity, permeability, pressure, etc., and the limits of the common supply have been 'reasonably defined by actual drilling operations' * * *". The last or quoted phrase within this quoted statement is extracted from Tit. 52 O.S.1951 § 287.4, which is one of the provisions of the "Unitized Management" law enacted by the 1951 Legislature as Senate Bill No. 203. The full context of said provision is: "Only so much of a common source of supply as has been defined and determined to be productive of oil and gas by actual drilling operations may be so included within the unit area." No provision requiring a common source of supply to be exactly defined by drilling operations before a well-spacing or pooling order may be entered with reference to it, has yet been enacted by our Legislature. Perhaps, until some means other than drilling is devised to conclusively ascertain productivity, such a statutory provision would be desirable as more certainly precluding the owner whose interest may not be underlain by the spacing area's common source of supply, or the productive part of the producing sand or structure, from participating in its production. But this might, in many instances, defeat the purposes of well-spacing and pooling. Our Legislature has apparently thus far been persuaded that chancing the possibility of some owners receiving benefits, to which subsequent explorations indicate they have not been entitled, is preferable to such a result. As the matter now stands, the lesser hazard is tolerated in preference to the greater hazard to the greater number of owners, and to the State in the dissipation of its natural resources by excessive drilling.

The foregoing demonstrates that the ownership of land interests found by the Commission, on the basis of evidence pertinent to the matter, to be overlaying the common source of supply is the minimum requirement, under a valid well-spacing or pooling order, for participation in the production of a well on the part of others than the owners under its lease. More certain proof of productivity, or "production acreage," though desirable and probably should be furnished when available, is not required. Proof of "productive acreage" was a necessary prerequisite of the "attribution" (allowables) order complained of in the Application of Little Nick Oil Co., 208 Okl. 695, 258 P.2d 1184; and the expressions appellants quote from our opinion therein do not apply here. While the "base" order there involved (No. 20536) had attached to it maps which purported to outline the boundaries of the three gas sands there dealt with, and said maps depicted said boundaries as including portions of Stanolind's lease, the order went further and "attributed" to each of the wells producing from said common source of supply, —or, in effect, it said they drained,—a specified number of acres. One of these wells was the Tendall No. 2 well, and, at the time Stanolind, without a hearing or the introduction of proof as to the matter, sought to have said well's allowable increased by having their lease included with-

in its "productive acreage," the well's total production acreages from each of the three sands had already been assigned or attributed, by previous order, to other leases. There we held that such a change or modification in previous orders could not be effected without a judicial hearing, as distinguished from the method there employed, and referred to in the opinion, as "an ex una parte procedure." The absence of any "substantial" evidence referred to there does not hold true here and that is the reason the cases appellants cite concerning the necessity of such evidence, do not apply. Here the only thing which might be termed a "productive acreage" determination. is the Commission's finding and order that each 640-acre unit shall be allowed one producing well (which, as we have seen, is supported by evidence that each well will drain that large an area) and that each owner in the unit shall participate in its production in the same ratio as his acreage bears to the acreage of the whole unit. Such a formula of participation is a reasonable and logical one (if perhaps not the most complete or accurate one that may be used when more sub-surface information becomes available) and the orders in this case, like the well-spacing Act, therefore cannot be said to be invalid or unconstitutional on the ground that said formula bears no reasonable relation to the purpose of protecting correlative rights—a purpose which is no longer open to dispute as a constitutional ground for the exercise of the State's police power. See Patterson v. Stanolind Oil & Gas Co., 182 Okl. 155, 77 P.2d 83, appeal dismissed 305 U.S. 376, 59 S.Ct. 259, 83 L.Ed. 231, and the discussion in connection with its citation in Wood Oil Co. v. Corporation Commission, Okl., 268 P.2d 878, 884. Appellants also quote expressions from our opinion in Application of Peppers Refining Co., Okl., 272 P.2d 416, concerning the importance of protecting correlative rights over securing to some owners maximum drilling and productive profits. Those expressions do not strengthen appellants' position here, for the Commission, by its orders, has in effect, determined that their correlative rights will not be violated by the well-spacing and pooling therein directed, and, as we have seen, appellants have failed to discharge their burden of establishing that such determination is not sufficiently supported by the evidence. See Grison Oil Corp. v. Corporation Commission, 186 Okl. 548, 99 P.2d 134. In the Peppers Refining Co. Case, we determined that the appellants discharged that burden at least in so far as applicable to one of the leases involved.

Nor can we agree with appellant's contention that Order No. 27771, goes "beyond the necessities of the case", or that it was entered without evidence of probative value showing that, without such an order waste of gas, physical or economic, would result, or that the correlative rights of any producer will be violated. The latter part of this proposition is based upon the premise, already herein rejected, that the evidence fails to show the land of the other owners in Sections 25 and 31 overlays the same gas reservoir or reservoirs that supply the Clapp and Humiston wells, and consequently, that they have no rights in such source or sources of supply. The first part of the above contention is merely appellants' conclusion from their interpretation of the fifth finding upon which Order No. 27771 is based. They say: "This is not a finding of waste of gas, either physical or economic, it is merely a finding by the Commission that some of those who purchased leases on less than 640 acres may have exercised poor business judgment." Without further lengthening this opinion to quote the finding and set forth an extended demonstration of the fallacy of appellants' argument, suffice it to say that in our opinion the finding in question is a proper and sufficient one on the subject of waste. Nor do we find substantiated in the record appellants' charge that this finding "is not supported by the evidence of a single witness." As hereinbefore indicated, practically all of the several witnesses who testified on the subject agreed that the drilling of more than one well was unnecessary to drain the gas from under 640 acres in the area; and there was also sufficient evidence to establish that the expense of drilling additional wells would not be economically feasible in

855

view of the slight additional gas they might recover from the common source of supply.

As we have found no cause for reversal in any of the arguments presented against the orders involved herein, they are all hereby affirmed.

JOHNSON, C. J., WILLIAMS, V. C. J., and CORN, ARNOLD, HALLEY and JACKSON, JJ., concur.

WELCH, J., concurs in result.