Smith HESTER et al., Plaintiffs in Error,

v.

SINCLAIR OIL AND GAS COMPANY and Corporation Commission of Oklahoma, Defendants in Error (two cases).

Nos. 38670, 38671.

Supreme Court of Oklahoma.

April 26, 1960.

T. Murray Robinson, Oklahoma City, for plaintiffs in error.

Ferrill H. Rogers, L. D. Hoyt, Oklahoma City, A. A. Davidson, James H. McGowan, Tulsa, for defendants in error.

BLACKBIRD, Justice.

The above styled and numbered appeals are so related that they have been considered, and will hereinafter be dealt with together, as if consolidated. They both involve a change in the 40-acre well spacing of part of what is presently known as the "East Criner-Payne Area", of McClain County. The involved part lies northwest of what we shall refer to as the "East Criner Field." The controversy as to whether this newly producing part of the area should remain under the 40-acre well spacing in effect in the East Criner Field

and the rest of the area, or whether or not the Corporation Commission should exclude it from such spacing, and order larger spacing units for it, was brought about by the drilling, or completion as a producer, of the Weimer-Fitz Start Unit well (hereinafter referred to merely as the "Start Unit" well) in Section 18, Township 6 North, Range 3 West. This well is more than a mile northwest of its nearest producer, the Gulf Baxter-Shartel Well, which is located in the East Criner Field. Both wells are producing from a structure, or one or more of a series of sands, known as the "Simpson Sand Series." In the Start Unit well, however, this producing horizon was encountered at a depth of more than 10,000 feet, whereas, in the wells of the East Criner Field, it was found at depths ranging from 8,600 to 8,800 feet approximately; and it seems to be conceded (at least for the purpose of these appeals) that the Start Unit's source of supply is different and separated from the East Criner Field's source of supply, by a fault.

On the theory that the area overlying the oil reservoir, newly discovered in the Start Unit well, should be recognized as a new producing area that should have larger spacing units than those of the East Criner Field, Sinclair Oil and Gas Company, one of the oil and gas lessees of land around the Start Unit well, filed two applications in this State's Corporation Commission, hereinafter referred to merely as the Commission. In one of these applications, docketed as instituting said Commission's cause CD No. 11395, the Company prayed the Commission to enter an order amending its previous order No. 32752, establishing 40-acre spacing in the East Criner field and another certain numbered order extending that spacing pattern to the area surrounding the Start Unit well, in such a way as to delete the Simpson Sand Series from the present 40-acre spaced area in Section 18 (in which said well is located) as well as in Section 19 (adjoining Section 18 on the south) and the west half of Section 17 (adjoining the latter section on the east).

In another application docketed as instituting the Commission's Cause CD 11414, the same Company sought a separate order that would establish 80-acre drilling and spacing units for the Simpson Sand Series, not only in the above described area it sought to have deleted from 40-acre spacing in Cause CD 11395, but also in all of the quarter sections adjoining the proposed deleted area on the north and west, in Sections 7, 8, 12, 13 and 24.

At the hearings the Commission held on the above described applications, same were opposed by various landowners and/or royalty owners. As hereinbefore indicated, the existence of a fault between the new well (Start Unit) and the older East Criner field was not seriously disputed. Its location, however, became the principal subject of inquiry and dispute at both hearings, and, defining, as it was apparently conceded to do, the boundary between the newly discovered reservoir, or source of supply, and the East Criner Field's source of supply southeast of the new well, the fault's location was recognized as the decisive factor in determining where the line of demarcation should be fixed between the area's 40-acre spacing and the 80-acre spacing proposed by the applicant Company.

The witness upon whom the applicant relied to show the location of this fault was one of its own District Geologists, named Browning Hudson, who was qualified as an expert in geology. On his direct examination in both causes, Hudson identified a so-called geological "structure" map he had prepared of the area, on which the fault was depicted, as a line drawn from the northern boundary of Section 8, in a southwesterly direction through said section, and extending through the West Half of Section 17, the northwest corner of Section 20, the southeast corner of section 19, the East Half of Section 30, and the West Half of Section 31, and the southern and eastern segment of Section 1. On his cross-examination by the attorney for the protestants, this witness revealed that said geological facts represented on the map, which was introduced in one cause as Exhibit 7,

and in the other as Exhibit 8 (hereinafter collectively referred to as Exhibit 7–8) were obtained from, or based upon, logs of the wells in the area and "seismic data." When called upon by protestants' counsel to produce the data, the witness and his employer, the applicant company, refused to do so on the ground that it was confidential and was not obtained at the company's expense to be given away by displaying, or revealing it, at a public hearing. Protestants' counsel took the position that, as an essential part of due process, his clients were entitled either to have this information made available for testing its competency, veracity or credibility, as well as possible impeachment of the applicant's evidence based thereon, or to have such evidence excluded or ignored, as based upon hearsay. In the discussion which followed the protestants' objection, counsel for the Commission conceded that, under strict rules of evidence, the witness' conclusions, and his map's representations, as to the location of the fault line based upon the unrevealed seismic information of more or less anonymous origin, would not be competent evidence, and cited previous causes in which certain described methods of obviating such objections had been successfully employed to the satisfaction of both the Commission and the interested parties. Later, when protesting royalty owners introduced their evidence, they had none to offer as to the location of the fault line, but they did introduce evidence disputing that previously introduced by the Company, to show that only one well, rather than two, should be permitted on each 80 acres in the area proposed for 80 acre spacing.

At the close of the hearing, the Commission took the two causes under advisement and thereafter entered separate orders therein. Neither in the order of deletion entered in Cause CD 11395, supra (Order No. 39015) nor in its order establishing 80-acre units in Cause No. CD 11414, supra (Order No. 39016) was the area described in the orders as large, or the same, as that sought to be deleted and

newly spaced, but it included less than ½ of such acreage lying west of the fault line, as depicted on the questioned map. The area deleted from 40-acre spacing, and placed under 80-acre spacing, was situated so as to be included within an imaginary line, forming a rectangle, drawn from the center of Section 7 straight south to the center of Section 19, thence straight west to the center of Section 24, thence straight north to the center of Section 12, and thence straight east to the point of beginning. The Eastern side, or boundary, of this rectangular area is a little less than one-fourth mile east of the Start Unit well, and leaves all of the acreage the Company proposed for 80-acre spacing in the West Half of Section 17, and the East halves of Section 18 and 19, and the Southwest Quarter of Section 19 still under 40-acre spacing. In so doing, the Commission has fixed the Eastern boundary of the 80-acre spacing at distances varying from almost one-half mile to a mile west and northwest of the fault line depicted on the applicant's questioned map (Exhibit 7–8).

The protesting landowners and royalty owners, hereinafter referred to as appellants, have perfected the within considered separate appeals from the Commission's above described orders (Nos. 39015 and 39016, supra). One of their arguments in both appeals is to the effect that the Commission's designation of the area for 80-acre spacing is arbitrary and without substantial evidence to support it. We agree.

In the briefs filed by the applicant Oil Company and the Commission, hereinafter collectively referred to as appellees, there is cited, in support of the orders, excerpts from the testimony of various witnesses, but we have carefully examined the entire records in both appeals and we find no evidence, that can be considered substantial, to support the Commission's selection of the area to be divided into 80-acre spacing units. The cited evidence does little more than establish the existence of the fault between the Start Unit well and the East Criner field, which, as hereinbefore indicated, is a conceded fact. Assuming, without

deciding, that it was error for the Commission to consider the questioned map's representations, and the part of Hudson's testimony, purporting to fix the location of the fault line, but, that such error was harmless because such evidence is not shown to have any relation to, nor to have been considered in, the Commission's determination of the area excluded from 40-acre spacing and placed under 80-acre spacing, where is the evidence justifying such determination?

We recognize that the dip, or slant, if any, of geological formations (like the Simpson Sand Series) can be ascertained, at points where wells are drilled, from the logs of said wells; and the applicants introduced large cross-section maps which purported to depict such data in the Start Unit well and certain wells in the East Criner Field, and, in which, an attempt was made to relate, or correlate, said data. Assuming that such well logs were what Hudson was referring to when he testified that his location of the fault line was based upon "sub-surface data" *as well as* "seismic data", the well logs themselves were not shown to reveal how close to the Start Unit well the same dip or slant found in the East Criner wells extended in the direction of that well. Those logs did not show that said dip or slant was *changed or disrupted* by a fault *either in the particular location shown on Exhibit 7–8,* or *at the locations designated, by the Commission,* as the boundaries of the acreage affected by its questioned orders.

Appellees say it was necessary "for the Commission, on the evidence submitted, to determine to the best of its ability, the size and shape thereof", and following this assertion, they cite Panhandle Eastern Pipe Line Co. v. Corp. Comm., Okl., 285 P.2d 847. In that case we recognized that, in order to accomplish the purpose of our oil conservation laws, it is often necessary to space areas whose boundaries have not yet been certainly, or unequivocally, defined by drilling operations, but we also recognized the desirability of using the best evidence available in defining it; and our State Constitution requires that the Commission's orders in such matters be supported by substantial evidence. See Art. IX, sec. 20, Okla.Const. The record in the present appeals indicates that the appellee company has evidence available to it in the form of seismic data, represented to have been used in preparing its aforementioned geological maps, but, irrespective of whether or not such data is authentic, and whether or not any error has occurred in its use in preparing those maps, which (because of the Company's refusal to produce the data) was never discovered, or revealed, there is certainly nothing approaching "substantial" evidence to warrant such a clear variance between the part of the area, proposed for 80-acre spacing, lying west of the fault line as depicted on Exhibit 7–8, and the particular acreage set apart for such spacing by the orders appealed from.

■■ Appellee's citation of evidence to support the orders includes reference to the Company's evidence on the issue of whether or not one well, in the acreage proposed for such spacing, will drain the oil from under a surface area as large as 80 acres. No successful attempt was made to definitely define the drainage pattern of any such well, however, or to show that a well near the eastern boundary of the acreage, selected for 80-acre spacing by the Commission, would drain oil only from a line coinciding with such boundary, rather than from a line nearer, or farther away from, such well. Furthermore, assuming that all land lying west of said eastern boundary will produce from the same source of supply as the Start Unit well, there is not one scintilla of evidence justifying the Commission's fixing of the *northern and southern* boundaries of the acreage encompassed by its orders. Appellees cite appellants' failure to produce any evidence showing the location of the fault that concededly separates the East Criner Field's source of supply from that of the Start Unit well. It is obvious that this failure furnishes no support for 80-acre spacing in the involved area, when it is remembered that the same acre-

age was included in the area for which 40-acre spacing was decreed by a previous order of the Commission, that has never been modified until the present proceedings. We must assume, until that order is modified by another one—*supported by substantial evidence*—that it was so supported. The previous order remains in force and effect until it is properly amended, modified or vacated; and, the burden was upon the party applying for a new and different pattern of well spacing, to produce evidence to support such a change.

In view of the foregoing, we can but conclude that the orders appealed from are without evidence to support them on the fundamental issue dealt with in appellant's Proposition I. That defect being fatal to said orders, they are hereby reversed without opinion as to other grounds of alleged error.

WILLIAMS, V. C. J., and WELCH, JOHNSON, JACKSON and IRWIN, JJ., concur.