CALVERT DRILLING COMPANY,
Appellant,

v.

CORPORATION COMMISSION of the
State of Oklahoma, Exxon Corporation,
and Kerr-McGee Corporation, Appellees.

No. 50909.

Supreme Court of Oklahoma.

Jan. 23, 1979.

Barth P. Walker, Russell James Walker, Oklahoma City, for appellant.

C. Harold Thweatt, Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, for appellee Exxon Corp.

B. J. Zimmerman, Charles C. Chastain and Kerr, Davis, Irvine, Krasnow, Rhodes & Semtner, Oklahoma City, for appellee Kerr-McGee Corp.

HARGRAVE, Justice:

The determinative question presented by this appeal from Order No. 129314 of the Oklahoma Corporation Commission is: Does the Commission have the power to extend a drilling and spacing unit to encompass land overlying the edge of the prospective Prue Common Source of Supply in Section 2, T14N, R4W, in Oklahoma County? The land covered by spacing units formed in the above order is subject to oil and gas interests owned by Calvert Drilling Company, the appellant, Exxon Corporation and Kerr McGee Corporation, the appellees. The spacing units established in the questioned order are two 320 acre units in Section 2, being the west and east half thereof.

Exxon Corporation applied for the 320 acre units after the appellant had completed a well with a calculated openflow potential of 6,854 MCF per day in the NW/4, of the SW/4 of Section 2. The spacing order is an extension of previously established units of the same size immediately to the west and south in the West Edmond field and extends that spacing over the east edge of the field proven to exist by the production from the above mentioned well in the NW/4 of the SW/4 known as the Snyder #1, and to the east half of that Section as a prospective common source. The trial examiner reviewed the testimony which uniformly demonstrates both a common source of supply, the lower Prue, and the existence of that common source of supply on both of the units requested. The trial authority denied the requested spacing on the basis of the views expressed in *Caudillo v. Corporation Commission,* Okl., 551 P.2d 1110 (1976), stating the area for which spacing is sought is not "entirely underlain by the Prue and this Commission does not have jurisdiction to space."

At the trial examiner's hearing, the first witness testified that a single well on each requested 320 acre spacing unit would adequately drain the Prue formation. This witness stated a continuation of the 320 acre stand-up spacing was preferable to a 320 prone spacing because the Snyder well was only 330 feet from what would be the south edge of a prone spacing unit in the north of the section and the present Snyder well would drain the west half of that prone unit.

This first witness noted there was a 25 year old abandoned Prue oil well in the NE of the SE of the section above Section 2 (Section 35). This witness also noted that there exists two zones of the Prue formation known predictably as the upper and the lower Prue. According to this witness, the upper Prue is not productive and is separated from the lower Prue by 10 to 20 feet of shale. This witness also stated that a well in the SE/4 of the SW/4 of Section 2 (Hilpert) showed a gross lower Prue thickness of 8 feet.

In Section 2, the witness noted there is 23 feet of productive Prue formation in the Calvert Snyder #1 in the NW/4 of the SW/4. For this reason, the witness stated it was his opinion that the east half of the SE/4 of Section 2 could not be excluded as possibly underlain by the productive Prue formation. Additionally, 4 feet of gross Prue formation is encountered by a well drilled in Section 1, to the east of the requested spacing units.

Mr. B. testified as a petroleum geologist on behalf of Kerr-McGee referring to an exhibit he prepared that approximately 130 acres would probably not be productive in the Prue and stated that until a well was drilled, one could not be sure.

Mr. C., a petroleum geologist for Kerr-McGee, testified to reasons for establishing a stand-up 320 acre unit in Section 2. They are: (1) all of the N/2 of the Section can be drained by the Snyder #1 as presently established; (2) drilling two wells in the west half under a lie-down unit would constitute economic and physical waste; (3) formation of a W/2 unit would prevent economic and physical waste; (4) lastly, formation of a lie-down unit in the Section would not prevent establishment of a

second well close to the present Snyder well. The witness stated that his exhibit is only an interpretation of available data and subsequent drilling could demonstrate that interpretation wrong and prove the existence of productive sand, although this exhibit reflects that the SE/4 of Section 2 may not be underlain with Prue.

All the exhibits included in the record of the trial examiner which disclose the location and thickness of the Prue sand are *net* isopach maps using an 8% porosity figure for a cutoff. The record does not reflect whether this refers to a porosity cutoff which excludes the presence of gas or oil or is a lower limit on the porosity necessary to support an economically productive well in its own right. It is, however, a fair conclusion from the record that gross Prue sand is encountered in Section 2 generally.

The appellant raises two points of error which are substantially encompassed in the objection that the evidence is uncontroverted that a portion of the land encompassed in the spacing order is not underlain by the common source of supply and therefore the Corporation Commission has no power to space the whole unit. The appellant takes the position that all the land spaced by the order of the Corporation Commission must overlie the common source of supply and the Corporation Commission has no power to space a unit of land not completely overlying the common source of supply. At the outset, from the application of this statement to the evidence of this case, a problem becomes apparent. That is, the purpose of preventing economic waste cannot be accomplished if one must know the boundaries of a formation exactly before a unit is established, because this exact knowledge is obtainable only by drilling, and that drilling is of itself one of the economic wastes sought to be prevented by the statute.

■ The appellant's argument then makes the assumption that the common source of supply, as defined in the statute, is limited not to the common formation in which the oil and gas is found, but to those portions of the formation to which a well may be drilled so as to produce in paying quantities. Under applicable statutes, the applicant for a spacing order need not establish the whole area is underlaid by a formation productive enough to support a well which would be economic in its own right; it is sufficient that the formation probably contains oil and gas capable of being withdrawn by a well on the drilling and spacing unit. 52 O.S.1971 § 86.1(c) states:

"The term 'Common Source of Supply' shall comprise and include *that area which is underlaid* or which, from geological or other scientific data, or from drilling operations, or other evidence, *appears to be underlaid, by a common accumulation* of oil or gas or both; . . . ." [Emphasis added]

52 O.S.1971 § 87.1 (since amended) contains the following provisions this Court deems pertinent to this appeal:

"(a) To prevent or to assist in preventing the various types of waste of oil or gas prohibited by statute, or any of said wastes, or to protect or assist in protecting the correlative rights of interested parties, the Commission, upon a proper application . . . shall have the power to establish well spacing and drilling units of specified and *approximately uniform size and shape covering any common source of supply,* . . .

(b) In establishing a well spacing or drilling unit for a common source of supply thereunder, the acreage to be embraced within each unit and the shape thereof shall be determined by the Commission from the evidence introduced at the hearing, and the following facts, among other things, shall be material:

(1) The lands embraced in the *actual or prospective common source* of supply; (2) the plan of well spacing then being employed or contemplated in said source of supply; (3) the depth at which production from said common source of supply has been or is expected . . . ..

(c) The commission shall have jurisdiction . . . to enlarge the area covered by the spacing order, if such proof discloses that the *development or the*

*trend of development* indicates that such common source of supply *underlies an area not covered* by the spacing order. . . . " [Emphasis added]

The appellant advances *Caudillo v. Corporation Commission,* supra; *Cameron v. Corporation Commission,* Okl., 418 P.2d ·932 (1966); and *Panhandle Eastern Pipe Line Co. v. Corporation Com'n,* Okl., 285 P.2d 847 (1955) for our consideration as authority for reversing Order No. 129314 here, stating this Court said therein that the Commission has no power to include land not overlying the common source of supply in a drilling and spacing unit. The appellant thus concludes the Order is fatally defective because the Commission had no power to include any portion of the section not overlying productive Prue as that formation was defined in the testimony and exhibits before the Commission. · This testimony does not define the absolute limits of the Prue, but only defines net Prue at an 8% porosity, without explaining the derivation of that limitation.

In *Panhandle Eastern Pipe Line Co. v. Corporation Com'n,* supra, the Court referring to drilling and spacing units discussed 52 O.S.1951 § 87.1 which contains similar provisions to those now found in 52 O.S. 1971 § 87.1 quoted above. In *Panhandle,* supra, at page 853, we note the following discussion pertaining to acreage subject to a spacing order which is material to the issues before us:

"  .   .. Tit. 52 O.S.1951 § 287.4, .   .   . is one of the provisions of the 'Unitized Management' law enacted by the 1951 Legislature as Senate Bill No. 203. The full context of said provision is: 'Only so much of a common source of supply as has been defined and determined to be productive of oil and gas by actual drilling operations may be so included within the unit area.' No provision requiring a common source of supply to be exactly defined by drilling operations before a well-spacing or pooling order may be entered with reference to it, has yet been enacted by our Legislature. Perhaps, until some means other than

drilling is devised to conclusively ascertain productivity, such a statutory provision would be desirable *as more certainly precluding the owner whose interest may not be underlain* by the spacing area's common source of supply, *or the productive part of the producing sand or* structure, *from participating in its production.* But this might, in many instances, defeat the purposes· of well-spacing and pooling. Our Legislature has apparently thus far been persuaded that chancing the possibility of some owners receiving benefits, to which subsequent explorations indicate they have not been entitled, is preferable to such a result. As the matter now stands, the lesser hazard is tolerated in preference to the greater hazard to the greater number of owners, and to the State in the dissipation of its natural resources by excessive drilling." [Emphasis added]

The statutory provisions of 52 O.S.1971 § 87.1 are identical to those provisions of the statute in force at the time of the above discussion, and the reference to the importance of protecting the State's natural resources from dissipation is more germane at the present than when the above observation was written.

In *Sinclair Oil & Gas Company v. Corporation Commission,* Okl., 378 P.2d 847 (1963), this Court discussed the effect of indeterminate shape and location of oil and gas structures on spacing orders at p. 852:

" * * *. Nor is geological opinion, that wells in a certain field will drain as large an area as 640 acres, under conditions existing generally in said area's reservoir, tantamount to a representation that all of the gas sand, or formation, under every part of ever unit in the field will contribute gas to a particular well, or wells, on said unit. And, if such representations were made, it would have less likelihood of veracity, where the units are of the size and shape of a surveyed surface section of land, and the wells are a mile apart. It was shown, and we know, as a matter of more or less common knowledge, that drainage patterns of oil

and gas wells do not conform to, nor coincide with, section lines, especially as to wells penetrating a common reservoir, whose drainage patterns are subject to shaping by changing conditions in the reservoir, and the interplay of these conditions with those in and around the bottom of the well bore. . . ."

We must examine the appellant's objection to the order of the Corporation Commission in the light of the decisions above referred to in the light of the obvious fact that on the edge of a common source of supply or a prospective common source of supply, the boundaries thereof are normally not describable in terms of a section or for that matter of any readily recognizable or readily legally describable unit. In *Panhandle,* supra, the Court made the statement at the outset of the opinion that the Commission has no power to include in a spaced area tracts that do not overlay the common source of supply. But in that opinion, at p. 851, this Court reviewed the effect of a dry well within a spaced area as it affects the validity of that spacing order. It is germane to our discussion of this case as the record discloses that a well on the formation sought to be spaced was not productive. Additionally, two wells southwest of Section 2 drilled within 150 feet of each other showed one productive and one not.

"How far and in what direction from these dry holes do they prove the upper morrow sand will not produce? This question was never answered. And the only positive conclusion that can be arrived at from the testimony of the expert witnesses, including both geologists and engineers who expressed an opinion on the matter, is that it can only be resolved by further drilling . . . [N]one of the witnesses could state conclusively how large an area around there, if any, these holes condemned for production purposes."

In *Panhandle,* supra, the Court approved the spacing order under consideration and a careful reading of the case requires the conclusion that the Corporation Commission has no authority to space areas proven not to be overlying the common source only where there is no substantial evidence which would justify a finding that the land contains the common source or *prospective common source,* and in the interest of conservation of economic and physical resources, doubt as to location should be resolved in favor of the unit as formed by the Commission. In the case before us, the experts agreed that only further drilling could resolve the doubt as to the extent of the underlying source of the east half of the unit.

*Caudillo,* supra, was adjudicated on the basis of the appellant's brief alone after default of the appellee's brief. This Court stated it was not bound to search out a theory for affirmance where the authority is reasonably supportive of the appellant's contentions citing *Harvey v. Hall,* Okl., 471 P.2d 911 (1970). In that case, the evidence disclosed less than 50% of the unit overlay the common source on a ten acre requested unit.

In *Cameron,* supra, the Court restated the Commission has no authority to establish a unit not overlying the common source. There, the facts behind the statement reveal the established fact that the source was not common, but comprised three separate sources aggregating about 47% productive acreage over a 2,720 acre area spaced in 180 acre units.

A determination as to whether there is substantial evidence to support a spacing order does not require that the evidence be weighed, but only that the supporting order be considered to determine whether it implies a quality or proof inducing conviction that the order was proper and furnishes a substantial basis of fact from which the issue tendered could reasonably be resolved. *Landowners, Oil, Gas & Roy. Own. v. Corporation Com'n,* Okl., 415 P.2d 942 (1966); *Crews v. Champlin Oil & Refining Company,* Okl., 413 P.2d 508 (1966).

In order to secure a reversal of the spacing order on the grounds the Commission had no authority to space land not overlying the common source, the appellant

must preclude the existence of a present or prospective common source. Here the experts agree that only further drilling or studies would preclude such a finding and there is no basis upon which to vacate the order.

Here the experts agreed that only further drilling on the east half of the section would determine the configuration of the prospective common source and the record confirms the presence of the established common source over 75% of the requested spacing unit. Those facts are substantial evidence supporting the extension of the spacing units to the newly discovered common source, and areas constituting the prospective common source spaced in this order.

The Commission's Order No. 129314 is affirmed.

LAVENDER, C. J., IRWIN, V. C. J., and WILLIAMS, HODGES, BARNES, SIMMS and OPALA, JJ., concur.

DOOLIN, J., dissenting.